1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARJORIE KNOLLER.,

           Plaintiff,

      v.

WALTER MILLER, Warden, Valley State
Prison for Women

          Defendants.

Case No.  12-cv-0996-JST

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS;
GRANTING IN PART CERTIFICATE
OF APPEALABILITY**

Re: ECF No. 1

Before the Court is the habeas corpus petition, filed by Petitioner Marjorie Knoller ("Petitioner") pursuant to 28 U.S.C. § 2254, challenging her detention for second degree murder. ECF No. 1. The Court will deny the petition.

I.     **PROCEDURAL HISTORY**

     In 2002, a Los Angeles Superior Court jury found Petitioner guilty of second degree murder, as well as involuntary manslaughter and ownership of a mischievous animal causing death, in connection with a fatal dog-mauling that occurred on January 21, 2001.

     The trial court judge, the Honorable James Warren, granted Petitioner's motion for a new trial on the murder charge, after concluding that the evidence did not support a finding that Petitioner possessed the implied malice necessary for a murder conviction, since the evidence did not demonstrate that she contemplated and disregarded a high probability that her actions on January 21 would cause another to die.  Petition for Writ of Habeas Corpus ("Petition"), Ex. B, ECF No. 1-2 at 41.  In 2005, a divided Court of Appeal panel reversed the order of a new trial on the murder conviction, concluding that Judge Warren had applied a legally incorrect definition of implied malice.  Petition, Ex. A, ECF No. 1-1 at 129.  In 2007, the California Supreme Court concluded that Judge Warren had applied a definition of implied malice that was too limited, while

the Court of Appeal had applied a definition that was too broad.  The Supreme Court reversed the Court of Appeal's decision and remanded the case for reconsideration of defendant's motion for a new trial in light of this standard.  <u>People v. Knoller</u>, 41 Cal.4th 139, 159 (2007).[1]

In August 2008, following briefing and oral argument, newly assigned trial court Judge Charlotte Woolard denied Petitioner's motion for a new trial.  Judge Woolard sentenced Petitioner to a term of 15 years to life.  Petitioner directly appealed the judgment in the California Court of Appeal. Petition, Ex. B.  In 2010, in a reasoned opinion, the California Court of Appeal ordered the abstract of judgment amended to reflect the judgment of the trial court and in all other respects affirmed the judgment.  <u>Id.</u>  The California Supreme Court summarily denied the petition for review. Petition, Ex. C, ECF No. 1-3. This petition followed.

## II.    STATEMENT OF FACTS

The following background facts describing the crime are from the opinion of the California Supreme Court.[2]

> In 1998, Pelican Bay State Prison inmates Paul Schneider and Dale Bretches, both members of the Aryan Brotherhood prison gang, sought to engage in a business of buying, raising, and breeding Presa Canario dogs. This breed of dog tends to be very large, weighing over 100 pounds, and reaching over five feet tall when standing on its hind legs. A document found in defendants' apartment describes the Presa Canario as "a gripping dog ... [¶] ... always used and bred for combat and guard ... [and] used extensively for fighting...."
> Prisoners Schneider and Bretches relied on outside contacts, including Brenda Storey and Janet Coumbs, to carry out their Presa Canario business. Schneider told Coumbs that she should raise the dogs.
>
> As of May 1998, Coumbs possessed four such dogs, named Bane, Isis, Hera, and Fury. Hera and Fury broke out of their fenced yard and attacked Coumbs's sheep. Hera killed at least one of the sheep

---

[1] This habeas petition does not challenge the constitutionality of the "implied malice" standard that was at issue in the 2005-2007 appeals.  However, Petitioner argues that, since there was no evidence she possessed any specific intent to kill, the errors she identifies in her trial make it more likely the jury may have been swayed towards concluding that she possessed the requisite implied malice.

[2] This summary is presumed correct. <u>Hernandez v. Small</u>, 282 F.3d 1132, 1135, n. 1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

United States District Court
Northern District of California

and also a cat belonging to Coumbs's daughter. Coumbs acknowledged that Bane ate his doghouse and may have joined Fury in killing a sheep.

Defendants Knoller and Noel, who were attorneys representing a prison guard at Pelican Bay State Prison, met inmate Schneider at the prison sometime in 1999. In October 1999, defendants filed a lawsuit on behalf of Brenda Storey against Coumbs over the ownership and custody of the four dogs. Coumbs decided not to contest the lawsuit and to turn the dogs over to defendants. Coumbs warned Knoller that the dogs had killed Coumbs's sheep, but Knoller did not seem to care.

Defendant Knoller thereafter contacted Dr. Donald Martin, a veterinarian for 49 years, and on March 26, 2000, he examined and vaccinated the dogs. With his bill to Knoller, Dr. Martin included a letter, which said in part: "I would be professionally amiss [sic ] if I did not mention the following, so that you can be prepared. These dogs are huge, approximately weighing in the neighborhood of 100 pounds each. They have had no training or discipline of any sort. They were a problem to even get to, let alone to vaccinate. You mentioned having a professional hauler gather them up and taking them.... Usually this would be done in crates, but I doubt one could get them into anything short of a livestock trailer, and if let loose they would have a battle. [¶] To add to this, these animals would be a liability in any household, reminding me of the recent attack in Tehama County to a boy by large dogs. He lost his arm and disfigured his face. The historic romance of the warrior dog, the personal guard dog, the gaming dog, etc. may sound good but hardly fits into life today." Knoller thanked Dr. Martin for the information and said she would pass it on to her client.

On April 1, 2000, both defendants and a professional dog handler took custody of the dogs from Coumbs. Bane then weighed 150 pounds and Hera 130 pounds. Coumbs told both defendants that she was worried about the dogs, that Hera and Fury should be shot, and that she was also concerned about Bane and Isis.

Hera remained for a short time at a kennel in San Mateo County while Bane was sent to a facility in Los Angeles County. Both defendants soon became concerned for the health of the two dogs. On April 30, 2000, defendants brought Hera to their sixth-floor apartment at 2398 Pacific Avenue in San Francisco. Bane arrived in September 2000. Codefendant Noel purchased dog licenses, registering himself and Knoller as the dogs' owners.

A later search of defendants' apartment showed that they frequently exchanged letters with Pelican Bay inmates Schneider and Bretches. Over 100 letters were sent and received between March and

3

December 2000, apparently under the guise of attorney-client correspondence. In the letters, defendants discussed a commercial breeding operation, considering various names such as GuerraHund Kennels, Wardog, and finally settling on Dog–O–War. Prisoners Schneider and Bretches' notes on a Web site for the business described Bane as "Wardog," and "Bringer of Death: Ruin: Destruction."

Between the time defendants Noel and Knoller brought the dogs to their sixth-floor apartment in San Francisco and the date of the fatal mauling of Diane Whipple on January 26, 2001, there were about 30 incidents of the two dogs being out of control or threatening humans and other dogs. Neighbors mentioned seeing the two dogs unattended on the sixth floor and running down the hall. Codefendant Noel's letters to prisoner Schneider confirmed this, mentioning one incident when defendant Knoller had to let go of the two dogs as they broke from her grasp and ran to the end of the hall. Noel described how the dogs even pushed past him and "took off side by side down the hall toward the elevator in a celebratory stampede!! 240 lbs. of Presa wall to wall moving at top speed!!!" In a letter to inmate Schneider, defendant Knoller admitted not having the upper body strength to handle Bane and having trouble controlling Hera.

When neighbors complained to defendants Noel and Knoller about the two dogs, defendants responded callously, if at all. In one incident, neighbors Stephen and Aimee West were walking their dog in a nearby park when Hera attacked their dog and "latched on" to the dog's snout. Noel was unable to separate the dogs, but Aimee threw her keys at Hera, startling Hera and causing Hera to release her grip on the Wests' dog. On another day, Stephen West was walking his dog when he encountered Noel with Bane. Bane lunged toward West's dog, but Noel managed to pull Bane back. When Stephen West next saw Noel, West suggested that Noel muzzle the dogs and talk to dog trainer Mario Montepeque about training them; Noel replied there was no need to do so. Defendants Knoller and Noel later encountered Montepeque, who advised defendants to have their dogs trained and to use a choke collar. Defendants disregarded this advice. On still another occasion, when dog walker Lynn Gaines was walking a dog, Gaines told Noel that he should put a muzzle on Bane; Noel called her a "bitch" and said the dog Gaines was walking was the problem.

There were also instances when defendants' two dogs attacked or threatened people. David Moser, a fellow resident in the apartment building, slipped by defendants Knoller and Noel in the hallway only to have their dog Hera bite him on the "rear end." When he exclaimed, "Your dog just bit me," Noel replied, "Um, interesting." Neither defendant apologized to Moser or reprimanded the dog.

4

Another resident, Jill Cowen Davis, was eight months pregnant when one of the dogs, in the presence of both Knoller and Noel, suddenly growled and lunged toward her stomach with its mouth open and teeth bared. Noel jerked the dog by the leash, but he did not apologize to Davis. Postal carrier John Watanabe testified that both dogs, unleashed, had charged him. He said the dogs were in a "snarling frenzy" and he was "terrified for [his] life." When he stepped behind his mail cart, the dogs went back to Knoller and Noel. On still another occasion, the two dogs lunged at a six-year-old boy walking to school; they were stopped less than a foot from him.

One time, codefendant Noel himself suffered a severe injury to his finger when Bane bit him during a fight with another dog. The wound required surgery, and Noel had to wear a splint on his arm and have two steel pins placed in his hand for eight to 10 weeks.

Mauling victim Diane Whipple and her partner Sharon Smith lived in a sixth-floor apartment across a lobby from defendants. Smith encountered defendants' two dogs as often as once a week. In early December 2000, Whipple called Smith at work to say, with some panic in her voice, that one of the dogs had bitten her. Whipple had come upon codefendant Noel in the lobby with one of the dogs, which lunged at her and bit her in the hand. Whipple did not seek medical treatment for three deep, red indentations on one hand. Whipple made every effort to avoid defendants' dogs, checking the hallway before she went out and becoming anxious while waiting for the elevator for fear the dogs would be inside. She and Smith did not complain to apartment management because they wanted nothing to do with defendants Knoller and Noel.

On January 26, 2001, Whipple telephoned Smith to say she was going home early. At 4:00 p.m., Esther Birkmaier, a neighbor who lived across the hall from Whipple, heard dogs barking and a woman's "panic-stricken" voice calling, "Help me, help me." Looking through the peephole in her front door, Birkmaier saw Whipple lying facedown on the floor just over the threshold of her apartment with what appeared to be a dog on top of her. Birkmaier saw no one else in the hallway. Afraid to open the door, Birkmaier called 911, the emergency telephone number, and at the same time heard a voice yelling, "No, no, no" and "Get off." When Birkmaier again approached her door, she could hear barking and growling directly outside and a banging against a door. She heard a voice yell, "Get off, get off, no, no, stop, stop." She chained her door and again looked through the peephole. Whipple's body was gone and groceries were strewn about the hallway. Birkmaier called 911 a second time.

At 4:12 p.m., San Francisco Police Officers Sidney Laws and Leslie

Forrestal arrived in response to Birkmaier's telephone calls. They saw Whipple's body in the hallway; her clothing had been completely ripped off, her entire body was covered with wounds, and she was bleeding profusely. Defendant Knoller and the two dogs were not in sight.

The officers called for an ambulance. Shortly thereafter, defendant Knoller emerged from her apartment. She did not ask about Whipple's condition but merely told the officers she was looking for her keys, which she found just inside the door to Whipple's apartment.

An emergency medical technician administered first aid to Whipple, who had a large, profusely bleeding wound to her neck. The wound was too large to halt the bleeding, and Whipple's pulse and breathing stopped as paramedics arrived. She was revived but died shortly after reaching the hospital.

An autopsy revealed over 77 discrete injuries covering Whipple's body "from head to toe." The most significant were lacerations damaging her jugular vein and her carotid artery and crushing her larynx, injuries typically inflicted by predatory animals to kill their prey. The medical examiner stated that although earlier medical attention would have increased Whipple's chances of survival, she might ultimately have died anyway because she had lost one-third or more of her blood at the scene. Plaster molds of the two dogs' teeth showed that the bite injuries to Whipple's neck were consistent with Bane's teeth.

Animal control officer Andrea Runge asked defendant Knoller to sign over custody of the dogs for euthanasia. Knoller, whom Runge described as "oddly calm," agreed to sign over Bane, but she refused to sign over Hera for euthanasia and she refused to help the animal control officers with the animals, saying she was "unable to handle the dogs." When tranquilizer darts malfunctioned and failed to quiet Bane, "come-along" poles were used by animal control officers backed up by officers with guns drawn. Hera too was controlled by officers with "come-along" poles.

On February 8, 2001, both defendants appeared on the television show Good Morning America and basically blamed mauling victim Whipple for her own death. Defendant Knoller claimed that Whipple had already opened her apartment door when something about her interested Bane. He broke away, pulled Knoller across the lobby, and jumped up on Whipple, putting his paws on either side of her. Knoller said she pushed Whipple into Whipple's apartment, fell on top of Whipple, and then tried to shield Whipple with her own body. But Whipple's struggles must have been misinterpreted by the dog, and when Whipple struck Knoller with her fist, the dog began

to bite Whipple. Knoller claimed that Whipple had ample opportunity to just slam the door of her apartment or stay still on the floor.

Codefendant Noel did not testify, but he presented evidence of positive encounters between the two dogs and veterinarians, friends, and neighbors. Defendant Knoller did testify in her own defense. She referred to herself, her husband, and Pelican Bay prisoner Schneider as the "triad," and she spoke of Schneider as her "son." The two dogs had become a focal point in the relationship. She denied reading literature in the apartment referring to the vicious nature of the dogs. She thought the dogs had no personality problems requiring a professional trainer. She denied receiving or otherwise discounted any warnings about the two dogs' behavior and she maintained that virtually all the witnesses testifying to incidents with the dogs were lying. She said she never walked both dogs together. Ordinarily, she would walk Hera and codefendant Noel would walk Bane, because she had insufficient body strength to control Bane. But after Noel was injured while breaking up a fight between Bane and another dog, Knoller would sometimes walk Bane, always on a leash. She said she had just returned from walking Bane on the roof of the apartment building, and had opened the door to her apartment while holding Bane's leash, when Bane dragged her back across the lobby toward Whipple, who had just opened the door to her own apartment. The other dog, Hera, left defendants' apartment and joined Bane, who attacked Whipple. Knoller said she threw herself on Whipple to save her. She denied that Hera participated in the attack. She acknowledged not calling 911 to get help for Whipple.

Asked whether she denied responsibility for the attack on Whipple, Knoller gave this reply: "I said in an interview that I wasn't responsible but it wasn't for the—it wasn't in regard to what Bane had done, it was in regard to knowing whether he would do that or not. And I had no idea that he would ever do anything like that to anybody. How can you anticipate something like that? It's a totally bizarre event. I mean how could you anticipate that a dog that you know that is gentle and loving and affectionate would do something so horrible and brutal and disgusting and gruesome to anybody? How could you imagine that happening?"

In rebuttal, the prosecution presented evidence that the minor character of defendant Knoller's injuries—principally bruising to the hands—indicated that she had not been as involved in trying to protect mauling victim Whipple as she had claimed. Dr. Randall Lockwood, the prosecution's expert on dog behavior, testified that good behavior by a dog on some occasions does not preclude aggressive and violent behavior on other occasions, and he mentioned the importance of training dogs such as Bane and Hera

7

not to fight.

People v. Knoller, 41 Cal. 4th 139, 144-50 (2007).

## III.    ANALYSIS

### A.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412–13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 405–06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's

United States District Court
Northern District of California

8

jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review. The Court of Appeal, in its opinion on direct review, addressed the two claims petitioner raises in the present petition. The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews here. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

### B.     Petitioner's Claims

Petitioner asserts the following grounds for relief: (1) denial of her constitutional right to counsel, (2) denial of her rights to confront witnesses and to a fair trial, and (3) that the cumulative effect of these errors was prejudicial. The California Court of Appeal rejected those claims in 2005, in the appeal that ultimately culminated with the California Supreme Court's 2007 decision in People v. Knoller. However, in that appeal the California Supreme Court reached only the question of the proper standard for "implied malice." The Court of Appeal addressed the aforementioned claims again in the 2010 appeal, which the California Supreme Court summarily dismissed.

#### 1.     Right to Counsel

The following background facts from the trial court proceeding are taken from the 2010 Court of Appeal decision:

> The prosecution and counsel for both defendant and codefendant Noel presented their closing arguments to the jury without any significant infringement on their arguments by the trial court. However, after the prosecution had given a little more than one-third of its rebuttal closing argument, Ruiz, defendant's attorney, objected on the basis that the prosecutor had misstated the evidence. The

9

court admonished counsel that this was closing argument and told her that "[t]here will be no further interruptions or you will be out of the courtroom."

Subsequently, the prosecution argued: "The evidence, and it's uncontradicted, is that time and time again they were warned wear a muzzle, put a choke collar on and they said in Mr. Noel's words I can do whatever I god damn please, I can go to any park I want with the dog off-leash." Counsel for defendant objected, stating "the dog was on leash at all times." At this point, the prosecution had made more than three-quarters of its rebuttal closing argument.

The court reprimanded Ruiz and stated the following: "Counsel, there will be no further objections. The jury will recall the evidence.

"Ladies and gentlemen, it is improper and counsel's conduct is improper by standing up in closing argument and objecting to her recollection of what the evidence was. The jury will recall what the evidence is. Arguments of counsel are not evidence and it is improper.

"And, Ms. Ruiz, please take your seat now and not get up again or the next objection will be made from the holding cell behind you.

"Ladies and gentlemen, counsel are entitled to argue what they believe the evidence is. If they are wrong, the jury will recall that. What counsel say the evidence is, is not the evidence. And it is not a proper objection to stand up in the middle of closing argument and insert your own interpretation of what the evidence is."

People v. Knoller, A123272, 2010 WL 3280200, at *55 (Cal. Ct. App. Aug. 20, 2010).

After the trial court's admonition, the prosecution continued its closing argument, quoting from a letter written by Defendant Noel regarding an earlier incident in which the dogs had become loose in the building's hallway:

Last thing I want you to think about, please, because this is a murder case and you try to recreate Diane Whipple's time in that hallway, what is it she saw before that first bite? ... Mr. Noel writes "before I could get my body in the doorway to block them, they pushed forward into the hall and took off side by side down the hall toward the elevator in a celebratory stampede." Think of Diane. "240 pounds of Presa wall-to-wall bouncing off and heading for the wall at the end of the hall." Exactly where Diane was standing before she was bitten by these dogs. Think about the ten minutes that she was ripped to death and her clothes ripped off her and then think about this because this is how she died because of their recklessness. Every time she tried to breathe, think of a breath in. Every time she

10

tried to breathe, her throat closed in on itself, every time. And she crawled, this young woman despite her to try to get home and she tried to breathe again and her throat closed in again. She tried to breathe again and she was alone, she was alone unable to even talk. And the dog was still running loose with her and she tried to breathe again, and her voice closing down with two holes in her larynx and she crawled and she tried to push herself up and she crawled some more to try to get home and no one was there, no one.

Id. at *63.  As the Court of Appeal further described the trial court proceedings:

Neither Ruiz nor the attorney for Noel objected during the remainder of the prosecution's closing rebuttal argument.

After the trial concluded, at the hearing on the motion for a new trial, the court considered the issue that its order to Ruiz to refrain from objecting any further supported a deprivation of counsel claim. The court explained: "This is not on the record and I am putting it on the record now for this reason. The way the courtroom in Los Angeles is set up, it's a very big court, a large room, much wider than this one. The jury box is over to my right, to your collective left and the way the tables were set up, Ms. Ruiz and her client were over to my left so that when you look at the jury box, you can't see them. Your back is turned, you have to physically turn.

"During the course of [the prosecutor's] rebuttal on March 19th, where I was watching them, the court had caught-and this was independently verified by security staff down in Los Angeles. I was caught by a substantial amount of noise coming from the defense table and I looked over and Ms. Knoller and Ms. Ruiz were engaged in a very animated discussion with a lot of waving of hands which included on the part of Ms. Knoller the 'Get up, get up, get up,' the waving of arms going up like that (indicating) and suddenly in the middle.... Ms. Ruiz for perhaps the second time in the trial did not make a speaking objection. She simply stood up and said 'Misstates the evidence.' It's the court's view that was an improper objection. The evidence that she was talking about was virtually impossible to identify and it was the court's view-and this was independently corroborated by security staff, ... who was so concerned about the amount of noise that he got up to stand over there because he was afraid that something was going to happen. The waving of hands, the 'stand up,' it appears to this court that this was an objection inserted into the record for the purposes of interrupting the flow of the prosecution's rebuttal argument and nothing more than that. [¶]

... [¶]

"This was a second objection which appeared to the court more to be-more designed to interrupt the flow of the prosecution's rebuttal

1    argument than anything else. And the court was quite stern with Ms.
2    Ruiz. The court indicated that there would be no further objections. I
     wish I had inserted the word 'improper' in there, I didn't, but my
3    description to the jury afterwards of why it is not proper for counsel
     to stand up in the middle of an argument and dispute a rather small
4    technical point of evidence, I certainly suggested that Ms. Ruiz
     remain in court and was free anytime under the obligation to insert
5    whatever objections she deemed appropriate on behalf of her client.
     She was never removed. And this should be considered a
6    compliment to Ms. Ruiz. I do not believe that she would be at all
     cowered into silence by any of my comments made from the bench."

7    Id. at *56.  Petitioner argues that, by ordering Ruiz not to object, the trial court prevented

8    Petitioner's counsel from objecting to the concluding portion of the prosecution's closing

9    argument.  Therefore, Petitioner argues, she was deprived of the assistance of counsel during a

10   critical stage of the proceedings, a structural error that mandates automatic reversal of her murder

11   conviction.

12        In rejecting this claim, the Court of Appeal held that any deprivation of counsel did not

13   qualify as per se reversible error, and held that under harmless error analysis, "any alleged

14   prosecutorial or judicial misconduct was harmless beyond a reasonable doubt."  Id., at *63.  The

15   court also stated in a footnote that it did not believe that the trial court's oral order in fact

16   prevented Petitioner's attorney from objecting, because "a reasonable attorney would have

17   interpreted the court's order as indicating that Ruiz was not to make any further 'improper'

18   objections," and that Ruiz had demonstrated in the past that she would continue to make

19   objections despite court orders forbidding it.  Id., at *87, n. 25.[3]

20        The Court first addresses whether mandating counsel to remain silent during a portion of

21   closing argument is structural error.

22                    a.        Sixth Amendment

23

24   _____

25   [3] A three-judge panel of the Court of Appeal first heard Knoller's appeal in 2005.  People v. Noel,
     128 Cal. App. 4th 1391, 28 Cal.Rptr.3d 369 (2005).  In that appeal, Justice Haerle dissented with
26   respect to Knoller's denial of counsel claim.  See id., 28 Cal.Rptr.3d at 455.  In his dissent, Justice
     Haerle concluded that the trial court committed per se structural error when it prohibited Knoller's
27   attorney from objecting during closing argument.  Id. at 458-460.  Additionally, the dissent also
     disagreed that the error resulting from the order was harmless.  Id. at 461.  The same judges sat on
28   the panel who heard the 2010 appeal; this time Justice Haerle joined in the majority opinion, and
     no judge dissented.  2010 WL 3280200.

United States District Court
Northern District of California

The Sixth Amendment guarantees an accused the right to "assistance of counsel for his defence." U.S. Const. Amend. VI. It has long been understood that the Amendment secures more than the right to the mere presence of counsel; it guarantees an accused the right to "effective assistance of counsel." U.S. v. Cronic, 466 U.S. 648, 654 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970)). "If no actual 'Assistance' . . . is provided, then the constitutional guarantee has been violated." Cronic, 466 U.S. at 654 (quoting U.S. Const. Amend. VI).

A habeas petition based on a deprivation of counsel theory may proceed along two separate paths. The first considers whether the state has committed a structural error, requiring a *per se* finding of prejudice without further inquiry. See Cronic, 466 U.S. at 658. Structural error is confined to "a very limited class of cases" in which a defect affects "the framework within which the trial proceeds, rather than simply an error in the trial process itself." Neder v. U.S., 527 U.S. 1, 8-9 (1999) (citations omitted); see Washington v. Recuenco, 548 U.S. 212, 218-219 (2006) ("We have repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal. Instead, most constitutional errors can be harmless.") In the context of deprivation of counsel, the Supreme Court has found structural error where "counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." Cronic, 466 U.S. at 660, n.25 (1984). Such error warrants "automatic reversal." Neder, 527 U.S. at 9.

The second path considers whether the state has committed error that, while not *per se* prejudicial, nonetheless prejudiced the result of the proceeding under the particular facts before the court. This occurs when an error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619 (1993).

The Court first addresses Petitioner's argument that the Court of Appeal unreasonably applied clearly established Federal law in determining that the trial court's error was not prejudicial *per se*.

### b. Structural Error

Under AEDPA, this Court reviews the court of appeal's conclusions to determine whether

13

1    they were "contrary to, or involved an unreasonable application of, clearly established Federal

2    law." 28 U.S.C. § 2254(d); Williams, 529 U.S. at 412-13.  The Supreme Court has narrowly

3    interpreted what constitutes a "clearly established" rule for the purpose of habeas review.  See e.g.,

4    Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 786 (2011) ("[I]t is not unreasonable 'for a state

5    court to decline to apply a specific legal rule that has not been squarely established by [the

6    Supreme] Court.'"); Premo v. Moore, __ U.S. __, 131 S. Ct. 733, 743 (2011) ("novelty alone--at

7    least insofar as it renders the relevant rule less than 'clearly established'--provides a reason to

8    reject . . . [the grant of habeas relief] under AEDPA").  The Supreme Court has also been hesitant

9    to expand the category of structural error requiring *per se* relief.  Neder, 527 U.S. at 8 ("we have

10   found an error to be 'structural,' and thus subject to automatic reversal only in a 'very limited class

11   of cases.'").  Accordingly, this Court must first determine whether the Supreme Court has clearly

12   established a rule that preventing defense counsel from objecting during a portion of the

13   prosecution's rebuttal argument is structural error warranting automatic reversal.  See Lockyer v.

14   Andrade, 538 U.S. 63, 71 (2003) (as a "threshold matter," the habeas court must first determine

15   what constitutes the relevant "clearly established" Supreme Court law).

16           Petitioner argues that the Supreme Court established such a rule in Cronic.  Petition, ECF

17   No. 1 at 35 (citing Cronic, 466 U.S. at 659, n. 25).  She grounds this conclusion in what she terms

18   "the plain meaning of Cronic," referring repeatedly to that case's observation that structural error

19   occurs when counsel is "prevented from assisting the accused during a critical stage of the

20   proceeding."  Id. at 37-38 (quoting Cronic, 466 U.S. at 659, n. 25).  Petitioner essentially contends

21   that this phrase establishes a rule requiring habeas relief whenever counsel is prevented from

22   assisting a defendant in any way during the course of a trial.  Petition at 35, 38.

23           The Court of Appeal found this argument unavailing.  After reviewing Supreme Court

24   cases in which a *per se* reversal rule was applied to deprivation of counsel claims, the Court of

25   Appeal concluded that Petitioner's proposed broad rule was unsupported by the relevant case law:

26                   Even if we presume Ruiz did refrain from making any further
                     objections during the prosecutor's rebuttal closing argument as
27                   a result of the court's oral order and threat to place her in the holding
                     cell, this did not deprive defendant of her Sixth Amendment right to
28

14

United States District Court
Northern District of California

the assistance of counsel requiring reversal per se. The Sixth Amendment guarantees a criminal defendant the right to assistance of counsel during critical stages of the proceedings. (<u>Herring v. New York</u> (1975) 422 U.S. 853, 857 (<u>Herring</u> ) [trial judge's order denying counsel opportunity to make summation at close of bench trial denied defendant assistance of counsel].) Closing argument is a critical stage of a criminal trial and the complete deprivation of the right to counsel at the defendant's closing argument requires reversal per se. (Ibid.) However, in the present case, defendant had counsel for the prosecution's closing argument, for her closing argument, and for most of the prosecution's rebuttal closing argument.

The Constitution "entitles a criminal defendant to a fair trial, not a perfect one." (<u>Delaware v. Van Arsdall</u> (1986) 475 U.S. 673, 681.) "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." (<u>Morris v. Slappy</u> (1983) 461 U.S. 1, 11.) It is well settled that "'most constitutional errors can be harmless.'[Citation.] '[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.' [Citation.] Indeed, we have found an error to be 'structural,' and thus subject to automatic reversal, only in a 'very limited class of cases.' [Citations.]" (<u>Neder v.. United States</u> (1999) 527 U.S. 1, 8, criticized on other grounds in <u>People v. McCall</u> (2004) 32 Cal.4th 175, 187, fn. 14.)

Constitutional violations that defy harmless-error review contain "a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.'[Citation .] Such errors 'infect the entire trial process,' [citation], and 'necessarily render a trial fundamentally unfair,' [citation]. Put another way, these errors deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence ... and no criminal punishment may be regarded as fundamentally fair.'[Citation.]" (<u>Neder v. United States</u>, <u>supra</u>, 527 U.S. at pp. 8-9.)

In our first opinion, we cited <u>United States v. Cronic</u> (1984) 466 U.S. 648 (<u>Cronic</u>), and concluded that the holding in Cronic required us to apply the harmless error analysis to this record. The United States Supreme Court stated in Cronic that the defendant is not entitled to perfect assistance and is only deprived of his or her Sixth Amendment right to effective assistance when the trial process "loses its character as a confrontation between adversaries . . . ." (<u>Id.</u> at pp. 656-657, fn. omitted.) The most obvious example is "the complete denial of counsel" "at a critical stage." (<u>Id.</u> at p. 659.) The Cronic court did not state that a limitation on counsel "during" a

critical stage constitutes structural error.

The holding in Cronic, supra, 466 U.S. at pages 658-662, has been reiterated by the United States Supreme Court in Bell v. Cone (2002) 535 U.S. 685, 696 (Bell ). The United States Supreme Court in Bell explained that it "identified three situations implicating the right to counsel [in Cronic ] that involved circumstances so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified. [Citation.] [ ] First and [m]ost obvious was the complete denial of counsel. [Citation.] A trial would be presumptively unfair, we said, where the accused is denied the presence of counsel at a critical stage, [citation], ... [fn. omitted.] Second, we posited that a similar presumption was warranted if counsel entirely fails to subject the prosecutions case to meaningful adversarial testing. [Citation.] Finally, we said ... where counsel is called upon to render assistance under circumstances where competent counsel very likely could not, the defendant need not show that the proceedings were affected." (Bell, supra, 535 U.S. at pp. 695-696.)

Under Cronic and Bell prejudice is presumed only under the most egregious conditions. Prejudice is presumed when the state interferes to the extent there is a complete deprivation of counsel during a critical stage of the proceeding. In addition, error by counsel may be presumed in the rare circumstances when counsel's actions undermined the reliability of the finding of guilty, such as, when counsel repeatedly slept through the guilt phase of the trial (e.g., Burdine v. Johnson (5th Cir.2001) 262 F.3d 336, 345), counsel was intoxicated during the entire trial (e.g., State v. Keller (1929) 57 N.D. 645 [223 N.W. 698] ), or counsel had an actual conflict of interest affecting performance (Cuyler v. Sullivan (1980) 446 U.S. 335). In the present case, we are only concerned with the state's interference causing the actual or constructive complete deprivation of counsel.

Defendant maintains that the standard set forth in Cronic and Bell was modified in Gonzalez-Lopez, supra, 548 U.S. 140, which was decided after we issued our first opinion in this matter.  The court in Gonzalez-Lopez announced the following rule: "Where the right to be assisted by counsel of one's choice is wrongly denied ... it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." (Id. at p. 148.)

Contrary to defendant's assertion, Gonzalez-Lopez did not refine or change harmless-error analysis for ensuring a fair trial under the Sixth Amendment. The court in Gonzalez-Lopez, supra, 548 U.S. 140, explained that the right to select counsel of one's choice has never been derived from the Sixth Amendment's purpose of ensuring a fair trial, but has "been regarded as the root meaning of the

constitutional guarantee." (<u>Id.</u> at pp. 147-148.) When a court erroneously refuses to permit a defendant to select his or her attorney for the entire trial, on appeal, prejudice need not be shown because the "[d]eprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." (<u>Id.</u> at p. 148.)

Defendant contends that the court in <u>Gonzalez-Lopez</u> disapproved of the fundamental test for structural error that we used in our prior opinion. Defendant's contention is simply not correct. The court in <u>Gonzalez-Lopez</u> explained that there were two different types of errors: The first type of error occurs "'during presentation of the case to the jury' " and its effect "may 'be quantitatively assessed in the context of other evidence presented in order to determine whether [the error was] harmless beyond a reasonable doubt.' " (<u>Gonzalez-Lopez</u>, <u>supra</u>, 548 U.S. at p. 148.) The second type of constitutional error is structural defects and they defy harmless error standard because they "'affect [t]he framework within which the trial proceeds,' " and are not 'simply an error in the trial process itself.' " (<u>Ibid.</u>) The court concluded that the "erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error."'" (<u>Id.</u> at p. 150.)

The <u>Gonzalez-Lopez</u> decision impacts those cases where the court at the beginning of trial erroneously refused to permit the defendant to have his or her counsel of choice and a different attorney provided the defendant with representation throughout the trial. That is clearly not the situation here and <u>Gonzalez-Lopez</u> is not applicable to defendant's appeal. Indeed, the definition of structural error used in <u>Gonzalez-Lopez</u> is precisely the one we applied in our prior opinion. The situation before us does not approximate the situation in <u>Gonzalez-Lopez</u> or any of the other cases where a court has held that there is prejudice per se based on, actual or constructive, complete deprivation of counsel. Courts have concluded that there is actual or constructive complete deprivation of counsel as a result of the state's actions in the following situations: counsel for defendant was prevented from giving any closing argument (<u>e.g.,</u> <u>Herring</u>, <u>supra</u>, 422 U.S. at p. 857); no counsel was appointed for an indigent defendant in a robbery prosecution (<u>Gideon v. Wainwright</u> (1963) 372 U.S. 335); the defendant was prevented from consulting counsel "about anything" during a 17-hour overnight recess (<u>Geders v. United States</u> (1976) 425 U.S. 80); the state law required the defendant to testify first or not at all, which deprived the defendant of "the 'guiding hand of counsel' " in the timing of this critical element of the defense (<u>Brooks v. Tennessee</u> (1972) 406 U.S. 605); the attorney was barred from conducting any direct examination of the client (<u>Ferguson v. Georgia</u> (1961) 365 U.S. 570); the defendant

was deprived of any counsel during the supplemental instruction to the jury (French v. Jones (6th Cir.2003) 332 F.3d 430); counsel was prevented from arguing an entire theory of the defense (e.g., Conde v. Henry (9th Cir.1999) 198 F.3d 734, 739); counsel was stopped from cross-examining a particular witness (e.g., Davis v. Alaska, supra, 415 U.S. at pp. 317-318); the defendant had no counsel at his arraignment in a capital case (Hamilton v. Alabama (1961) 368 U.S. 52, 55); the defendant had no counsel when he entered a guilty plea at the preliminary hearing, and this initial plea was introduced into evidence at the defendant's trial (White v. Maryland (1963) 373 U.S. 59, 60); and the defendant had requested counsel but did not receive any at the time he was convicted and sentenced (Williams v. Kaiser (1945) 323 U.S. 471).

The cases cited in Cronic, supra, 466 U.S. at page 659, "involve instances where something having to do with the truth-seeking process was prevented by court ruling, or where the part to be played in that process by defense counsel was wholly absent." (Green v. Arn (6th Cir.1987) 809 F.2d 1257, 1265, italics added.) The case before us differs significantly from these rare cases that have reversed for structural error as the truth-seeking or adversarial process was not significantly frustrated. Ruiz was not precluded from giving any part of her closing argument (e.g., Herring, supra, 422 U.S. at p. 857), from arguing an entire theory of the defense (e.g., Conde v. Henry, supra, 198 F.3d at p. 739), from communicating with her client (e.g., Geders v. United States, supra, 425 U.S. 80), or from cross-examining a particular witness (e.g., Davis v. Alaska, supra, 415 U.S. at pp. 317-318).

At best, the court limited Ruiz's ability to object during the last part of the prosecution's closing rebuttal argument. The Herring court clarified that the judge retains the power to control the courtroom, including limiting or interfering with the attorney's argument: "This is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained. The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects he must have broad discretion." (Herring, supra, 422 U.S. at p. 862.) Here, the judge did not threaten Ruiz with being placed in the holding cell until after she had completely flouted his prior orders, including his admonition minutes earlier that if she continued to interrupt, she would be out of the courtroom.

Indeed, the trial court has the authority to control the courtroom. Here, it needed to control Ruiz who had defiantly ignored its

18

warning that further interruptions would result in her being banished from the courtroom and who had shown a complete disregard for other court orders, even when such orders stated that a violation would result in contempt.

Although not exactly the issue presented here, our Supreme Court has made clear that a ruling that adversely affects the defense's closing argument does not necessarily result in prejudice per se. Our Supreme Court specified that to the extent that In re William F. (1974) 11 Cal.3d 249,"a case in which no argument at all was permitted[,] implies that error adversely affecting defense counsel's closing argument necessarily infringes on the defendant's constitutional right to the assistance of counsel [citation], it is unsound and is hereby disapproved." (People v. Bonin (1988) 46 Cal.3d 659, 695, fn. 4,overruled on other grounds in People v. Hill (1998) 17 Cal.4th 800, 823, fn. 1.) Here, defense counsel's closing argument was not affected. Only her ability to object to the last fraction of the prosecutor's rebuttal closing argument was arguably impacted.

Rather than point to any case that resulted in per se reversal under conditions similar to the situation present here, defendant cites to contempt cases. (See e.g., Cannon v. Commission on Judicial Qualifications (1975) 14 Cal.3d 678, 695-697; Sacher v. United States (1952) 343 U.S. 1, 9; Cooper v. Superior Court (1961) 55 Cal.2d 291, 298-302 ["'When a defendant has been denied any essential element of a fair trial or due process, even the broad saving provisions of section 4 1/2 of article VI of our state Constitution cannot remedy the vice and the judgment cannot stand' "].) These contempt decisions are concerned with courts' failures to follow lawful contempt procedures.

Despite the limited applicability of these contempt cases, defendant quotes the following from Sacher v. United States, supra, 343 U.S. 1: "Of course, it is the right of counsel for every litigant to press his claim, even if it appears farfetched and untenable, to obtain the court's considered ruling." (Id. at p. 9.) Defendant, however, excises the remainder of the court's statement, which explains: "Full enjoyment of that right, with due allowance for the heat of controversy, will be protected by appellate courts when infringed by trial courts. But if the ruling is adverse, it is not counsel's right to resist it or to insult the judge-his right is only respectfully to preserve his point for appeal. During a trial, lawyers must speak, each in his own time and within his allowed time, and with relevance and moderation. These are such obvious matters that we should not remind the bar of them were it not for the misconceptions manifest in this case." (Ibid.) The Sacher decision does not suggest that any interference with the attorney's ability to press his or her claim results in reversal. Rather, the court makes it clear that the

attorney's obligation is to make a record sufficient for appeal and the court retains the power to control the proceeding.

The other contempt cases cited by defendant are similarly unavailing. The court in <u>Cooper v. Superior Court</u>, <u>supra</u>, 55 Cal.2d 291, acknowledges that an attorney has a duty to make objections on his or her client's behalf, and a judge cannot absolutely foreclose that. (<u>Id.</u> at p. 302.) The court in <u>Cannon v. Commission on Judicial Qualifications</u>, <u>supra</u>, 14 Cal.3d 678, reviewed the decision to remove a judge who had, as well as other actions, incarcerated public defenders and effectively denied the defendants the effective right to counsel because substituted counsel had insufficient time to prepare. (<u>Id.</u> at pp. 696-697.) Neither decision suggests that any threat of incarceration combined with a restriction on the ability to object results in prejudice per se. Indeed, our Supreme Court has clarified that the removal of counsel does not automatically result in prejudice. (<u>People v. Jones</u> (2004) 33 Cal.4th 234, 243-244 [trial court has authority to remove indigent defendant's appointed attorney because of potential conflict of interest].) If removal does not result in automatic prejudice, then the threat of removal combined with the order not to make any more objections cannot result in automatic prejudice.

In any event, these contempt cases are essentially irrelevant to the issue before us. As already stressed, the complete deprivation of counsel is structural error because "the entire conduct of the trial from *beginning to end* is obviously affected by the absence of counsel for a criminal defendant...." (<u>Arizona v. Fulminante</u> (1991) 499 U.S. 279, 307, 309-310, italics added.) A constitutional deprivation is a structural defect "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." (<u>Id.</u> at p. 310, <u>see also People v. Bonin</u>, supra, 46 Cal.3d at p. 695.) We know of no case holding that limiting an attorney's role or ability to object during a portion of the closing argument results in prejudice per se. Ruiz does not argue that she was foreclosed from raising a defense, from presenting an argument, or from objecting throughout the entire critical stage of closing argument. Rather, her sole complaint is that she suffered prejudice because, subsequent to her being told to stop objecting, the prosecutor improperly appealed to the jurors' passions and prejudice. Such a complaint is an issue of prejudice easily addressed by a harmless error analysis and does not approach the level of establishing that her trial was *so fundamentally unfair* that the court's actions undermined the reliability of the finding of her guilt. (See, e.g., <u>People v. Hill</u>, <u>supra</u>, 17 Cal .4th at pp. 844-847.)

Defendant ignores the warning in <u>Cronic</u> that the defect "at the critical stage" must undermine the entire adversary process (<u>Cronic</u>, supra, 466 U.S. 657), and maintains that any limitation on counsel

during a critical stage results in reversal per se. She quotes the following footnote in <u>Cronic</u>: "The court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." (<u>Id.</u> at p. 659, fn. 25.) According to defendant, the court "prevented" Ruiz from assisting her by ordering Ruiz not to object any further during the last portion of the prosecution's rebuttal closing argument or she would be doing it from the holding cell. In a footnote, the United States Supreme Court in <u>Bell v. Cone</u> has explained the meaning of this footnote in <u>Cronic</u>. (<u>Bell</u>, <u>supra</u>, 535 U.S. at p. 696, fn. 3.) The court clarified that this footnote states that no prejudice needs to be shown when the criminal defendant "had actually or constructively been denied counsel [at a critical stage] by government action." (<u>Ibid.</u>) As discussed, <u>ante</u>, the court expressly stated that the holding in <u>Cronic</u> is that the state's action must result in the actual or constructive "'*complete* denial of counsel.'" (<u>Bell</u>, <u>supra</u>, at p. 696, italics added.)

Here, harmless error applies in a situation where counsel objected all through trial and throughout most of the closing argument. As already highlighted, this is not a situation where Ruiz was barred from making an objection during the entire closing argument, nor was she in any way barred from making a motion or presenting evidence regarding a defense. Rather, this is a situation where the court instructed her not to interrupt any further or she would be expelled and placed in the holding cell. Rather than structural error, this situation is similar to when a reviewing court considers the erroneous overruling of an objection during closing rebuttal argument or considers prosecutorial or judicial misconduct when objecting would be futile (see, <u>e.g.</u>, <u>People v. Hill</u>, <u>supra</u>, 17 Cal.4th at pp. 844-847). Under both of these circumstances, it is well settled that the reviewing court applies a harmless error analysis.

At best, defendant could argue that it was futile for her attorney to object during the final moments of the closing rebuttal argument, but automatically reversing the judgment on this basis contravenes our Supreme Court's precedent. Our Supreme Court has applied the harmless error analysis in a situation where the attorney did not object to the alleged prosecutorial misconduct throughout the trial because the judge had made it clear that such objections would be denied and ridiculed. (<u>People v. Hill</u>, <u>supra</u>, 17 Cal.4th at pp. 821-822, 844-847 [counsel could infer from trial court's prior rulings and comments that it disfavored additional interruptions during the questioning of witnesses or during closing argument and therefore Supreme Court applied harmless error to alleged prosecutorial misconduct].)

"[T]he harmless-error doctrine is essential to preserve the principle that the central purpose of a criminal trial is to decide the factual

United States District Court
Northern District of California

question of the defendants guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.'" (<u>Arizona v. Fulminante</u>, <u>supra</u>, 499 U.S. at p. 308.) "Correctly applied, harmless error and structural error analyses produce identical results: unfair convictions are reversed while fair convictions are affirmed. Expanding the list of structural errors, however, is not mere legal abstraction. It can also be a dangerous endeavor. There is always the risk that a sometimes-harmless error will be classified as structural, thus resulting in the reversal of criminal convictions obtained pursuant to a fair trial. Given this risk, judges should be wary of prescribing new errors requiring automatic reversal. Indeed, before a court adds a new error to the list of structural errors (and thereby requires the reversal of every criminal conviction in which the error occurs), the court must be certain that the errors presence would render every such trial unfair." (<u>Sherman v. Smith</u> (4th Cir.1996) 89 F.3d 1134, 1138.)

Knoller, 2010 WL 3280200, at *57-63 (footnotes omitted).  The State likewise contends that Petitioner's interpretation of <u>Cronic</u> is excessively broad.  Answer, ECF No. 14 at 47-48.

Because most of Petitioner's argument centers on footnote 25 in <u>Cronic</u>, it is appropriate to undertake a close examination of the footnote's text, and its place in the Supreme Court's deprivation of counsel jurisprudence.  In <u>Cronic</u>, the Supreme Court was confronted with the question of whether an attorney's lack of preparation and experience had so prejudiced a criminal defendant as to require an automatic reversal of conviction.  466 U.S. at 648.  The Supreme Court held that it had not.  <u>Id.</u> at 666.

In reaching its conclusion, <u>Cronic</u> described the state of the Supreme Court's jurisprudence on Sixth Amendment deprivation of counsel claims.  It observed that an accused has the right not only to the presence of counsel, but "the right to effective assistance of counsel," such that an incompetent attorney will not suffice.  <u>Id.</u> at 654 (<u>quoting</u> <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n. 14 (1970)).  <u>Cronic</u> went on to note that, in addition to this category, certain circumstances are so likely to deny a defendant his right to effective counsel that the verdict must be reversed on appeal without further consideration of the underlying merits, the "most obvious" example of which "is the complete denial of counsel." 466 U.S. at 658.  In a footnote, <u>Cronic</u> observed that "[t]he Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of

22

1   the proceeding." Id. at n. 25.  Petitioner contends that the second clause of this footnote clearly

2   establishes the rule requiring *per se* reversal of her conviction.

3       As Petitioner notes, the Cronic footnote "founded this express statement of the rule on no

4   less than seven of its own prior decisions."  Petition at 35.  Canvassing the cited decisions is

5   instructive.  See Geders v. U.S., 425 U.S. 80, 91 (1976) (defendant prevented from consulting

6   counsel about anything during 17-hour overnight recess between his direct examination and cross-

7   examination); Herring v. New York, 422 U.S. 853, 863-64 (1975) (counsel prevented from giving

8   any closing argument); Brooks v. Tennessee, 406 U.S. 605, 612-613 (1972) (state law requiring

9   defendant to testify first or not at all deprived defendant of "the guiding hand of counsel" in

10  determining whether to testify after the close of the prosecution's case); Hamilton v. Alabama, 368

11  U.S. 52, 55 (1961) (petitioner denied counsel at arraignment in capital case); White v. Maryland,

12  373 U.S. 59, 60 (1963) (defendant had no counsel when he entered a guilty plea that was later put

13  into evidence at his trial); Ferguson v. Georgia, 365 U.S. 570 (1961) (attorney barred from

14  conducting direct examination of his client); Williams v. Kaiser, 323 U.S. 471, 475-476 (1945)

15  (defendant pled guilty to robbery after State of Missouri denied his petition for aid of counsel).

16      While Petitioner identifies the above-cited cases as the basis for the rule in Cronic, she

17  does not argue that the facts of her own case are analogous.  Nor does she cite the facts of any

18  other Supreme Court case and argue that her situation falls within its holding.  Instead, Petitioner

19  rests her case on the "plain meaning of Cronic," asserting that the second clause of footnote 25

20  establishes a "bright line" rule susceptible of only one interpretation.  Petition at 37.

21      But the meaning of the footnote is not self-explanatory.  Nor is it an availing interpretive

22  exercise to read the footnote in isolation from the rest of Cronic.  In other words, the stand-alone

23  phrase "prevented from assisting the accused" is not particularly illuminating.  Petitioner's reading

24  of Cronic is that, during trial, any wrongful interference with counsel's assistance of a client,

25  however brief or slight, requires *per se* reversal, but that interpretation is not reflected in the

26  Supreme Court's case law.  If that were the rule, it would be a significantly impactful one

27  requiring *per se* reversal of many convictions.  And at that point, the *per se* rule would no longer

28  be confined to a "very limited class of cases."  Neder, 527 U.S. at 8.

United States District Court
Northern District of California

23

It is evident from the context of the footnote that <u>Cronic</u> does not purport to establish such a "bright line" rule.  The statement is dictum in an opinion holding that there had been no structural error.  And, in the footnote, the <u>Cronic</u> court was summing up a series of past decisions. <u>See</u> 466 U.S. at 658, n. 25.  The words the <u>Cronic</u> court used in a footnote to summarize these past decisions is not the sort of "clearly established" law that can form the basis of a meritorious habeas petition. <u>Cf.</u> <u>Williams</u>, 529 U.S. at 412 ("Clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions").  The <u>Cronic</u> court was not called upon to define precisely what types of interferences suffice to "prevent [counsel] from assisting the accused" such that *per se* reversal is warranted.  Indeed, in a later footnote, <u>Cronic</u> noted that even when counsel's effectiveness is affected by a "external constraint" imposed by the trial court judge, that "does not make it any more or less likely that . . . [the defendant] received the type of trial envisioned by the Sixth Amendment, nor does it justify reversal of his conviction absent an actual effect on the trial process or the likelihood of such an effect."  466 U.S. at 662, n. 31.

To be sure, a petitioner need not wait until the Supreme Court decides a case with precisely the same facts before she or he can obtain habeas relief.  The task under AEDPA is to ensure that the state court has reasonably applied the "governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Lockyer</u>, 538 U.S. at 71-72 (2003).  But the facts of the Supreme Court's cases, and in particular the decisions referred to in the <u>Cronic</u> footnote, provide the content of the "governing legal principle" the court must apply when determining whether counsel was so "prevented from assisting the accused" as to require *per se* reversal.

There is a spectrum of cases finding *per se* prejudice from a court-imposed limitation on a defendant's access to legal assistance.  At one end is <u>Gideon v. Wainwright</u>, 372 U.S. 335, 345 (1963), in which a defendant was completely denied counsel for the entirety of his trial.  At the other end are cases in which counsel was present but prevented by the judge from rendering a particular type of assistance.  <u>See</u>, <u>e.g.</u>, <u>Herring</u>, 422 U.S. at 863-64 (counsel prevented from giving any closing argument); <u>see</u> <u>also</u> <u>Gomez v. U.S.</u>, 490 U.S. 858 (1989) (automatic reversal

United States District Court
Northern District of California

1 | where defense counsel was present for, but prohibited from conducting, *voir dire*).

2 |     Determining precisely where Petitioner's case falls along the Supreme Court's spectrum is

3 | not a simple task.  But on habeas review, that is not this Court's assignment.  Instead, the Court

4 | asks whether the state court, in denying Petitioner's claim, contravened a clearly established

5 | Supreme Court rule or unreasonably applied clearly established Supreme Court precedent.  28

6 | U.S.C. § 2254(d); <u>Williams</u>, 529 U.S. at 412–13.  The Court of Appeal carefully reviewed the

7 | Supreme Court's cases and concluded that the type of interference to which Petitioner was

8 | subjected is not the type that had been previously recognized as sufficient to trigger the rule of *per*

9 | *se* reversal.  <u>Knoller</u>, 2010 WL 3280200, at *55-59 (<u>see</u> <u>also</u> <u>Noel</u>, 28 Cal.Rptr.3d at 444-51 (2005

10 | analysis of same claim)).  The Court of Appeal correctly concluded that the interference here -

11 | denying counsel the ability to object during a portion of the prosecutor's closing argument - falls

12 | short of the kinds of interferences found by the Supreme Court to be within the "very limited class

13 | of cases" requiring automatic reversal.  <u>Neder</u>, 527 U.S. at 8.

14 |     The Court of Appeal noted that, in contrast to the cases cited in the <u>Cronic</u> footnote, here

15 | counsel "was not precluded from giving any part of her closing argument…from arguing an entire

16 | theory of the defense…from communicating with her client…or from cross-examining a particular

17 | witness."  <u>Knoller</u>, 2010 WL 3280200, at *59.  Because of the limited scope of Judge Warren's

18 | order--bearing only on counsel's ability to object to a portion of rebuttal--the Court of Appeal

19 | concluded that Knoller's case presented a situation more like "when a reviewing court considers

20 | the erroneous overruling of an objection during closing rebuttal argument or considers

21 | prosecutorial or judicial misconduct when objecting would be futile."  <u>Id.</u> at *96.  In both

22 | circumstances, "it is well settled that the reviewing court applies a harmless error analysis."  <u>Id.</u>[4]

23 | _____

24 | [4]  Also apparently guiding the Court of Appeal's determination is a line of Supreme Court cases defining the purpose of harmless error review, as contrasted with structural error review. <u>See</u>

25 | <u>Knoller</u>, 2010 WL 3280200, at *90.  In <u>United States v. Gonzalez-Lopez</u>, 548 U.S. 140, 148 (2006), the Supreme Court observed that trial error occurs "during the presentation of the case,

26 | and [its] effects may be 'quantitatively assessed in the context of other evidence presented in order to determine whether [it was] harmless beyond a reasonable doubt.  In contrast, structural defects

27 | "'defy analysis by harmless-error standards because they 'affec[t] the framework within which the trial proceeds.'"  <u>Id.</u>; <u>see</u> <u>also</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 629-630 (1993); <u>Puckett v.</u>

28 | <u>United States</u>, 556 U.S. 129, 141 (2009).  Recognizing that these cases in no way supplant the

United States District Court
Northern District of California

1       Petitioner has directed the Court's attention to the Ninth Circuit's recent *en banc* decision

2  in Frost v. Van Boening, __ F.3d __, No. 11-35114, 2014 WL 1677820, at *1 (9th Cir. Apr. 29,

3  2014), which the Court does find instructive.[5]  Under Herring, it is structural error to deny counsel

4  the opportunity to conduct closing argument.  422 U.S. at 863-64.  In Frost, the trial court

5  permitted counsel to conduct a closing argument, but improperly limited him to arguing only one

6  of two potential defenses.  2014 WL 1677820, at *1-2.  The Frost panel divided sharply on

7  whether Herring "clearly extended" to this situation, with a bare majority concluding that it did.

8  Compare Frost, 2014 WL 1677820, at *4-8 to id. at *9, 15 (Tallman, J., dissenting).

9       But the facts of the present case are nowhere near as comparable to any previously decided

10  Supreme Court decision as Frost's facts are to Herring.  In Frost, the majority concluded that the

11  case before it not only fell within Herring's general rule, but was in fact "far worse than what

12  occurred in Herring," since in Herring neither side had made closing argument, while in Frost the

13  prosecution was allowed to present theories of the case that defense counsel was forbidden from

14  addressing.  2014 WL 1677820, at *5.  Notably, none of the judges on the Frost panel endorsed

15  the rule urged by Petitioner: that it has been "clearly established" since Cronic that *any*

16  interference with counsel's ability to assist his or her client at trial is inherently structural error.  If

17  this were the rule, Frost would have been a much easier, and shorter, decision.

18       Measured against the high standard of review under AEDPA, the Court is not persuaded

19  that the Court of Appeal acted unreasonably in concluding that automatic reversal was not

20  required on these facts.  See Wright v. Van Patten, 552 U.S. 120, 126 (2008) ("Because our cases

21

22

23  Supreme Court's decisions determining what constitutes structural error, this Court notes that

24  because the ostensible error here is isolated to a single statement, it is possible to weigh its effect
against the rest of the evidence presented throughout the trial in the same way a reviewing court

25  ordinarily undertakes harmless error analysis.  See Gonzalez-Lopez, 548 U.S. at 148.  In other
words, the error is not one that "defies analysis by harmless error standards."

26  [5] A court of appeal decision "does not constitute clearly established Federal law, as determined by
the Supreme Court," Renico v. Lett, ⎯ U.S. ⎯⎯, 130 S.Ct. 1855, 1866 (2010), but circuit law

27  "may be persuasive authority for purposes of determining whether a particular state court decision
is an 'unreasonable application' of Supreme Court law, and also may help [courts of appeals]

28  determine what law is 'clearly established.'"  Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir.
2000).

1   give no clear answer to the question presented… 'it cannot be said that the state court

2   unreasonabl[y] appli[ed] clearly established Federal law.'") (quoting 28 U.S.C. § 2254(d)(1)).

3   The Court of Appeal's conclusion that Judge Warren's order did not rise to the level of structural

4   error is neither unreasonable nor contrary to settled Supreme Court precedent.

5                          **c.      Prejudicial Error**

6          Petitioner contends that even if the Court does not find structural error, the deprivation of

7   counsel during part of prosecution's rebuttal argument "exerted a substantial and injurious effect

8   on the verdict within the meaning of Brecht [v. Abrahamson, 507 U.S. 968 (1992)] thereby

9   warranting habeas relief" under harmless error analysis. ECF No. 1 at 48.

10         Petitioner advances two theories under which she contends the Court should find

11  prejudicial error.  First, she argues that the court of appeal's order prejudiced the jury against

12  defense counsel by conveying that the court held a low opinion of her and that she "was not to be

13  trusted in her own summation of the evidence." Id.  Second, Petitioner contends that the court's

14  order forbade her counsel from objecting to the prosecutor's improper appeal to the jurors'

15  emotions in his closing argument, and that the emotional appeal had prejudicial effect on the

16  verdict.  Id.  Petitioner suggests that this emotional appeal was especially damaging in light of the

17  high bar that the prosecution faced in proving the elements of second degree murder given the

18  absence of evidence that Petitioner possessed any intent to kill.  Id. at *49.

19         The court of appeal held that any prosecutorial or judicial misconduct was harmless

20  beyond a reasonable doubt, and that any error that occurred did not prejudice the verdict.  Id. at

21  *63.  In short, it concluded that in the context of the entire trial, the emotional appeal made in

22  rebuttal, though improper, was not substantial enough to prejudice the verdict, and that Judge

23  Warren's demeanor toward counsel "fall[s] far short of establishing misconduct" under the

24  standard set by California law.  Id. at *66.

25         The Court first addresses Petitioner's prosecutorial misconduct claim, and then turns to her

26  claim of judicial misconduct.

27                          **1)      Prosecutorial Misconduct**

28  Even where a constitutional error has occurred, unless the error is structural, a habeas court

United States District Court
Northern District of California

27

1   should grant relief only if it concludes that the error had a "substantial and injurious effect or

2   influence in determining the jury's verdict." Brecht, 507 U.S. at 637-38.  Under this standard,

3   "claimants are entitled to relief …only if they can establish that 'actual prejudice' resulted" from

4   the error. Id. at 621.  In the context of prosecutorial misconduct, this means a showing that the

5   error "so infected the trial with unfairness as to make the resulting conviction a denial of due

6   process." Darden v. Wainwright, 477 U.S. 168, 181 (1986).  Darden is the "clearly established

7   Federal law" for assessing prosecutorial misconduct habeas claims.  Parker v. Matthews, __ U.S.

8   __, 132 S. Ct. 2148, 2153 (2012).

9       Courts have identified six factors from Darden that guide harmless error analysis.  Hein v.

10   Sullivan, 601 F. 3d 897, 914 (9th Cir. 2010).  These assess "[1] the weight of the improper

11   evidence, [2] the prominence of the comment in the context of the entire trial, [3] whether the

12   prosecution misstated the evidence, [4] whether the judge instructed the jury to disregard the

13   comment, [5] whether the comment was invited by the defense counsel in its summation, and [6]

14   whether defense counsel had an adequate opportunity to rebut the comment." Id.

15       In Darden, the Supreme Court considered a litany of improper arguments made by the

16   prosecution in closing. Darden, 477 U.S. at 181.  These included emotionally charged statements

17   such as "I wish [the victim] had had a shotgun in his hand when [the defendant] walked in the

18   back door and [had] blown [defendant's] face off…I wish that I could see him sitting here with no

19   face, blown away by a shotgun…I wish someone had walked in the back door and blown his head

20   off," and "[the defendant] shouldn't be out of his cell unless he has a leash on him and a prison

21   guard at the other end of that leash." Id. at181, n. 12.

22       The Supreme Court held that despite the "objectionable content" of the prosecution's

23   argument, under the relevant standard of review "these comments…did not deprive petitioner of a

24   fair trial." Id. at 182.  The Court reasoned that "much of the objectionable content was invited by

25   or was responsive to the opening summation of the defense" and "[t]he trial court instructed the

26   jurors several times that their decision was to be made on the basis of the evidence alone, and that

27   the arguments of counsel were not evidence." Id.  The Court further noted that the weight of

28   evidence against the petitioner was heavy" which "reduced the likelihood that the jury's decision

United States District Court
Northern District of California

28

1   was influenced by argument." Id.

2        Here, the level of prosecutorial misconduct does not approach that of Darden, and

3   reviewed under the Darden factors, this Court cannot conclude that the prosecutorial misconduct

4   exerted a "substantial and injurious effect" on the verdict.

5        The Court of Appeal noted that the "few comments" that could be characterized as

6   improper "primarily focused on the evidence." Knoller, 2010 WL 3280200, at *99.[6]  It held that

7   most of "the prosecutor's argument…was proper rebuttal[,] . . . helped establish [Petitioner's]

8   disregard for human life," and that it was "particularly relevant to dispute defendant's claim that

9   she attempted to protect [the victim]." Id. at *98.

10       As in Darden, the trial court instructed the jury that it was not to be "swayed by sympathy,

11  passion or prejudice in reaching its verdict," and in response to defense counsel's objections twice

12  reminded the jury during the contested rebuttal argument that "arguments of counsel are not

13  evidence" and that "[t]he jury will recall what the evidence is." Id. at *85.  Before jury

14  deliberations the court again instructed the jury that they "must not be influenced by sentiment,

15  conjecture, sympathy, passion, prejudice, public opinion or public feeling."  As the State notes in

16  its brief, the Court "must presume that the jury followed these instructions."  ECF No. 14 at 64-65

17  (citing CSX Transp., Inc. v. Hensley, 556 U.S. 838, 841 (2009)) ("The jury system is premised on

18  the idea that rationality and careful regard for the court's instructions will confine and exclude

19  jurors' raw emotions…in all cases, juries are presumed to follow the court's instructions.").

20        Additionally, the court of appeal noted that "the evidence against defendant was strong

21  and there is not a reasonable possibility that the prosecutor's comments affected the verdict."

22  Knoller 2010 WL 3280200, at *65.  Supporting the guilty verdict was voluminous testimony that

23  Knoller's dogs had lunged at, attacked, and bitten other people and dogs in her presence,

24  sometimes causing serious injury, that Knoller had been warned that these dogs had no training

25  and had in the past killed sheep, that the dogs were, in the words of a veterinarian, a "liability,"

26  reminding him of a recent attack in which a boy had lost his arm and had his face disfigured, that

27

28  [6] The Court, to be clear, undertakes its own prejudicial error review pursuant to Brecht.

United States District Court
Northern District of California

1    Knoller could not, and often did not control the dogs, that Knoller was entirely unresponsive to

2    complaints about her dogs and acted in "disregard of the danger" they posed, and that after her

3    dogs mauled Ms. Whipple to death, Knoller failed to call 911 or otherwise seek help, and did not

4    inquire into Ms. Whipple's condition despite returning to the scene of the killing to retrieve her

5    apartment keys. Id. at *41-43.

6          Petitioner disputes the strength of the evidence against her noting, among other things, that

7    Judge Warren "found the evidence insufficiently weighty to justify a murder as opposed to

8    manslaughter conviction." But on appeal the California Supreme Court held that Judge Warren's

9    conclusions were based upon his application of an incorrect legal standard. Id. at *29. Applying

10   the clarified legal standard on remand, the trial court determined that "[t]he jury properly

11   examined and weighed the totality of the evidence in reaching…its verdict that defendant Knoller

12   was guilty of second degree murder." Id. at *33. As the State points out in its brief, "although

13   Knoller again insists that it was 'virtually impossible' to demonstrate implied malice based on her

14   view of what the law required, Petition at 49, the jury, the trial court on remand, and the California

15   Court of Appeal found that there was 'clear, substantial and credible' evidence to support second

16   degree murder." ECF No. 14 at 65 (quoting Knoller, 2010 WL 3280200, at *49).

17         Finally, as the State points out, in the two California cases cited by Petitioner for her

18   proposition that it is improper for a prosecutor to appeal to the jury's emotions, the courts found

19   that no prejudice resulted from those emotional appeals. People v. Stansbury, 4 Cal. 4th 1017,

20   1057 (1993) (no prejudice found where prosecutor argued, "[t]hink what she must have been

21   thinking in her last moments of consciousness during the assault. Think of how she might have

22   begged or pleaded or cried," because "this was but a single reference in a long, complex and

23   otherwise scrupulous argument about the facts of the case"); People v. Fields, 35 Cal. 3d 329, 362

24   (1983) (no prejudice resulted from prosecution's plea to "think of yourself as [the victim]"

25   because the evidence of guilt was overwhelming).

26         In her Traverse, the Petitioner argues that her case is similar to People v. Vance, 188 Cal.

27   App. 4th 1183 (2010), in which the court of appeal granted a new trial because of prosecutorial

28   misconduct. ECF No. 22 at 22-24. However, the facts of that case too are distinguishable, not

1   only because it was reversed on the more forgiving <u>Chapman</u> standard used on direct review, but

2   also because the prosecution's improper arguments were both more sustained and more egregious

3   than in the present case.  In <u>Vance</u>, the prosecutor made an emotional appeal, which began with

4   her urging the jury to "walk in [the victim's] shoes," continued by asking the jurors to "literally

5   relive in [their] mind's eye and in [their] feelings what [the victim] experienced," and then

6   continued further in this vein throughout closing argument.  <u>Id.</u> at 1199.[7]  Unlike the present case,

7   the <u>Vance</u> court noted that the emotional appeal cannot be "dismissed as isolated" because it

8   pervaded closing arguments.  <u>Id.</u> at 1200-1201 (holding that "[t]he sheer number of instances of

9   prosecutorial misconduct…is profoundly troubling.  Considered together [the court] conclude[s]

10  they created a negative synergistic effect, rendering the degree of overall unfairness to defendant

11  more than that flowing from the sum of the individual errors").

12      Moreover, in <u>Vance</u> there was a paucity of evidence in that case to support the charge of

13  first degree murder.  <u>Id.</u> at 1204-1206.  As noted above, here, the prosecution put on voluminous

14  evidence going to Petitioner's state of mind.  Additionally, in <u>Vance</u> the court noted that the

15  prosecutor "asked the jury to go beyond the evidence," <u>id.</u> at 1206, which stands in contrast to this

16  case in which the "few comments" that could be characterized as improper "primarily focused on

17  the evidence." <u>Knoller</u> 2010 WL 3280200, at *64.

18      Ultimately, the invitation for jurors to "think" of the victim does not approach the

19  magnitude of the egregious appeal to emotion in <u>Vance</u>, or even the conduct in <u>Darden</u> that fell

20  short of the standard permitting habeas relief.  This Court is persuaded that the error did not have a

21  "substantial and injurious effect on the verdict."

22          **2)      Judicial Misconduct**

23      Petitioner further contends that Judge Warren's order, which "declared Ms. Knoller's

24  counsel both guilty of misconduct and deserving of expulsion from the courtroom," was

25

26  [7] After her initial remarks, the prosecutor improperly urged the jury to consider the victim's "pain and suffering," to imagine what the victim was thinking in his last moments, and to imagine what

27  it would feel like to suffocate.  <u>Id.</u> at 1194.  She then continued by improperly asking jurors to consider the victim's family's suffering, casting aspersions on the defense attorney, and describing

28  the defendant's appearance in court as "extremely deceptive" and "pitiful."  <u>Id.</u> at 1195-1196.

United States District Court
Northern District of California

"unwarranted and unfair" and prejudiced the jury's verdict. ECF No. 1 at 48.  As the Court of

Appeal described California's law regarding judicial misconduct:

> A trial court commits misconduct if it *persistently* makes
> discourteous and disparaging remarks so as to discredit the defense
> or create the impression it sides with the prosecution. (<u>People v.
> Fudge</u>, <u>supra</u>, 7 Cal.4th at p. 1107.) A judge's comments are
> evaluated "'on a case-by-case basis, noting whether the peculiar
> content and circumstances of the court's remarks deprived the
> accused of his right to trial by jury.' [Citation.] 'The propriety and
> prejudicial effect of a particular comment are judged both by its
> content and by the circumstances in which it was made.' " (<u>People
> v. Sanders</u> (1995) 11 Cal.4th 475, 531-532.)

<u>Knoller</u>, 2010 WL 3280200, at *65.

Here, Petitioner challenges two of the court's remarks both made during prosecution's

rebuttal argument in response to defense counsel's objection.  In response to the first objection the

court admonished counsel that "[t]here will be no further interruptions or you will be out of the

courtroom." <u>Knoller</u> 2010 WL 3280200, at *55.  When defense counsel objected to another

statement shortly thereafter the court gave the following order:

> "Counsel, there will be no further objections. The jury will recall the
> evidence.
>
> "Ladies and gentleman, it is improper and counsel's conduct is
> improper by standing up in closing argument and objecting to her
> recollection of what the evidence was. The jury will recall what the
> evidence is.   Arguments of counsel are not evidence and it is
> improper.
>
> "And Ms. Ruiz, please take your seat now and not get up again or
> the next objection will be made from the holding cell behind you."

<u>Id.</u>  As the Court of Appeal noted, "[t]he facts and decisions cited by defendant are very different

from the misconduct alleged here." <u>Id.</u> at *66. The court did not display "persistent antagonism

toward defense counsel," and instead, "was rather tolerant of [her] speaking objections and

constant attempts to insert her own interpretations of the evidence." <u>Id.</u> The court of appeal also

noted that counsel was "extremely disruptive…throughout the trial" and committed misconduct

including "purposefully disobeying a prior gag order, improperly telling the jury that the victim

was a lesbian" and that "charges were only brought against her client 'to curry favor with the

1   homosexual community,' and disregarding the court's prior admonitions not to interrupt." Id. at

2   *60 n. 27.

3       The Court of Appeal concluded that though the court was excessive in its final

4   admonitions to counsel, the court "did not speak derisively about [counsel] or the defenses

5   presented." Id. at *66. "[T]he entire transcript does not demonstrate unfairness or undue criticism"

6   so much as "a desire to control the proceedings." Id.  The court of appeal concluded that Judge

7   Warren's demeanor toward counsel "falls far short of establishing misconduct," and that that, at

8   the worst, the transcript reveals Judge Warren's "irritation with counsel" in front of the jury,

9   which does not rise to the level of misconduct.  Id., at *66.

10      The Court of Appeal's findings are sound.  While evincing his irritation with counsel,

11  Judge Warren's remarks do not rise to the level of the persistent and discourteous behavior

12  required for a finding of judicial misconduct, and this Court does not conclude that they had a

13  "substantial and injurious effect on the verdict," as required for a finding of prejudicial error.

14  Accordingly, no habeas relief can be granted on this theory.

15          **d.       The Effect of Judge Warren's Order**

16      The Court of Appeal's conclusion that Judge Warren's order did not have the actual effect

17  of silencing Petitioner's counsel was unreasonable, because there was no factual basis for it.

18  Judge Warren's direction to Ruiz was clear:  "Ms. Ruiz, please take your seat now and not get up

19  again or the next objection will be made from the holding cell behind you."  Any reasonable

20  lawyer in Ruiz's position could only have concluded that to object further – whether the objection

21  was "improper" or not – was to risk being escorted from the courtroom and into a holding cell.

22  The Court of Appeal points to nothing in the record showing that Ruiz was prepared to take that

23  risk, and it is implausible that any lawyer would have.

24      Nonetheless, Judge Warren's order still does not provide a basis for habeas relief, because

25  the Court of Appeal was not unreasonable in concluding that, even if the order had the effect of

26  chilling Ruiz's ability to object, it did not amount to structural error, and such error was also not

27

28

United States District Court
Northern District of California

33

1    prejudicial under <u>Brecht</u>.[8]

2                   **2.      Confrontation Clause and Right to a Fair Trial**

3         The Court adopts the following facts from the Court of Appeal decision:

4              Two of the letters written by Noel were admitted into evidence
5         during [Corrections Department Special Agent] Hawkes's testimony
          that connected defendant to the Aryan Brotherhood. Hawkes
6         testified about a letter written by Noel to Schneider on December
          27, 2000. The letter was on the joint legal letterhead of Noel and
7         defendant and marked "Confidential Legal Mail." Before the
          prosecution read the letter into evidence, counsel for defendant
8         objected, arguing the jury should be instructed that the letter should
          be considered only against Noel. The court overruled the objection.
9         Subsequently, it noted that counsel for defendant had brought this
          issue up in her opening statement. Hawkes testified that Schneider
10        had stabbed a lawyer in court and the knife used had an Aryan
          Brotherhood symbol on it. One portion of the letter read to the jury
11        stated: "I don't think Marjorie's ever told you what my response,
          with which she agreed immediately, was upon hearing that, every
12        time we were told that [Schneider had stabbed his attorney], 'If he
          did, he must have had a damned good reason and the smuck [sic ]
13        probably deserved it.' "

14             The prosecution read further from the letter regarding the Boyd case.
15        Boyd was an inmate who was killed at Pelican Bay and who was a
          witness in another case. The letter from Noel stated: "When
16        someone early on in the Boyd case from the defense side made
          mention of possibly wanting to depose you, Marjorie and I both
17        agreed that we would have no problem being in such a setting with
          you but that I would just want to make it clear that I was not sitting
18        between you and the door and if you went for the door, all she or I
          would do was to wave good-bye and wish you good luck and God's
19        speed."

20

21

22    _____

23    [8] More broadly, the Court's order today should not be read as an endorsement of any aspect of
      Judge Warren's order to Ms. Ruiz.  The order was erroneous, and inappropriate.  But the question
24    here is not whether this Court believes that the state trial court erred such that the Court of Appeal
      should have reversed Petitioner's conviction – or, to put it another way, whether this Court
25    believes that Justice Haerle's 2005 dissent was correct, and the majority's opinion was not – but
      the "markedly different" question of whether Petitioner is entitled to habeas relief.   <u>Nazarian v.</u>
26    <u>Uribe</u>, CV 10-6466-JFW JPR, 2012 WL 4739909, at *1 (C.D. Cal. Oct. 4, 2012); <u>see also</u>
      <u>Harrington v. Richter</u>, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011) ("[a] state court's
27    determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists
      could disagree' on the correctness of the state court's decision" (quotation omitted)).

28

United States District Court
Northern District of California

In this letter, Noel indicated no surprise that Schneider had been carrying a weapon when he testified at the trial of a former Pelican Bay prison guard. The prosecution read: "I had no doubt that you were carrying. Neither I nor Marjorie had any fear of you for a couple of reasons. If you went for the door and your route of travel was through the spot where I was standing, I would get my ass out of the way so you had a clear shot at the door, window, et cetera."

Hawkes testified regarding a second letter written by Noel to Bretches on January 12, 2001. Again defendant's joint legal letterhead was used and was marked "Confidential Legal Mail." The letter was "[r]egarding mutts and other matters." The letter concerned two inmates who were enemies of the Aryan Brotherhood and were prosecution witnesses in a federal case against the Aryan Brotherhood. One had dropped out of the Aryan Brotherhood, and Hawkes testified that the consequence of dropping out was death. In the letter, Noel identified the location of a protected witness, which, in Hawkes's opinion, could result in great bodily harm to that witness. Noel's letter did not reference defendant, except to say: "Hope tomorrow is a good mail day. It always is if we hear from either you or Paul and a really great day if we hear from you both."

Defendant also objects to the admission of four letters that Noel wrote to the inmates regarding the Presas. At the close of the prosecution's case, the prosecutor read into the record a redacted letter from Noel to inmate Bretches, with the salutation, "Dear Dale and Paul," dated October 3, 2000, and marked "Confidential Legal Mail." This letter expressed delight at the Presas meeting him at the door and their escape into the hallway after defendant was forced to let go of their leashes. Trial counsel for defendant stated on the record that she had no objection to the admission of this letter.

Noel wrote a similar letter sent October 10, 2000, to Bretches with the salutation, "Dear Dale and Paul," on joint legal letterhead and marked "Confidential Legal Mail." In this letter he again describes an incident where the Presas escaped into the hallway when he entered the apartment. Defendant's trial attorney again stated on the record that she had no objection to the admission of this letter.

On October 17, 2000, Noel wrote to Bretches about his reading Manstopper and his laughing when he read the part about his losing a finger. Finally, in a letter written by Noel to Schneider on January 11, 2001, on joint legal letterhead and marked, "Confidential Legal Mail," Noel recounted his becoming used to the "jail break" approach the Presas had and the Presas' confrontation with two other dogs. He also reported an incident involving the Presas' exiting the elevator door and meeting Whipple, "a timorous little mousy blond[e], who weighs less than Hera[.]" He remarked that Whipple almost "ha[d] a coronary[.]"

Knoller, 2010 WL 3280200, at *50-52.

Petitioner argues that the admission of Noel's letters violated her Sixth Amendment right to confront witnesses, asserting that facially incriminating statements made by nontestifying codefendants are inadmissible under Bruton v. United States, 391 U.S. 123 (1968).

35

United States District Court
Northern District of California

1    "Confrontation Clause violations are subject to harmless error analysis." <u>United States v.</u>

2    <u>Nielsen</u>, 371 F.3d 574, 581 (9th Cir.2004); <u>see</u> <u>also</u> <u>United States v. Allen</u>, 425 F.3d 1231, 1235

3    (9th Cir.2005.  For purposes of federal habeas corpus review, the standard is whether the

4    allegedly inadmissible evidence "'had substantial and injurious effect or influence in determining

5    the jury's verdict.'"  <u>Hernandez v. Small</u>, 282 F.3d 1132, 1144 (9th Cir.2002) (<u>quoting</u> <u>Brecht v.</u>

6    <u>Abrahamson</u>, 507 U.S. 619, 637 (1993)).

7         Petitioner argues that the trial court's admission of letters written by nontestifying

8    codefendant Robert Noel violated Petitioner's Sixth Amendment right to confront witnesses.  ECF

9    No. 1 at 52.

10        The Court of Appeal held that even if the trial court erred in admitting the letters,  the error

11   was harmless beyond a reasonable doubt, <u>citing</u> <u>Chapman v. California</u>, 386 U.S. 18 (1967).

12   <u>Knoller</u>, 2010 WL 3280200, at *52.  The Court of Appeal reasoned that the evidence establishing

13   second degree murder against Petitioner was sufficient to support the convictions even without the

14   letters.  <u>Id.</u> at *53.

15                          a.        **The Confrontation Clause**

16        The Confrontation Clause of the Sixth Amendment provides that, in criminal cases, the

17   accused has the right to "be confronted with the witnesses against him."  U.S. Const. Amend. VI.

18   The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a

19   procedural rather than a substantive guarantee.  <u>Crawford v. Washington</u>, 541 U.S. 36, 61 (2004).

20   It commands not that evidence be reliable, but that reliability be assessed in a particular manner:

21   by testing in the crucible of cross-examination.  <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>Davis v. Alaska</u>, 415 U.S. 308,

22   315–16 (1974) (noting "a primary interest" secured by the Confrontation Clause "is the right of

23   cross-examination").  The right to cross-examine under the Confrontation Clause provides the

24   opportunity to "expose to the jury the facts from which jurors ... could appropriately draw

25   inferences relating to the reliability of the witness."  <u>Davis</u>, 415 U.S. at 318.

26        The Confrontation Clause applies to all "testimonial" statements. <u>Crawford</u>, 541 U.S. at

27   50–51. "Testimony ... is typically a solemn declaration or affirmation made for the purpose of

28   establishing or proving some fact." <u>Id.</u> at 51 (internal quotation and citation omitted). "An accuser

36

United States District Court
Northern District of California

who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. The Supreme Court has further refined this test, holding that a statement is "testimonial when…the primary purpose…is to prove past events potentially relevant to later criminal prosecution." Davis v. Washington, 547 U.S. 813, 821-822 (2006)

"Only statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." Davis, 547 U.S. at 821-822. "It is the testimonial character of the statement that separates it from other hearsay that . . . is not subject to the Confrontation Clause." Id.

Crawford and Davis are "clearly established Federal law" for the purposes of this action because Crawford was decided in 2004 while Knoller's case was still on direct review. For the purposes of AEDPA, the source of clearly established Federal law refers to "Supreme Court holdings at the time of the state court's last reasoned decision." Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005) (citing Williams, 529 U.S. at 412).[9]

### 1)      The Letters Are Not Testimonial Statements

A full analysis of this issue requires the Court to reach an issue not addressed by the Court of Appeal, but raised by the State in response this petition: whether the Confrontation Clause even applies to these letters.

Under the circumstances of this case, the Confrontation Clause does not apply. Noel's letters were sent to prison inmates, and were not made during an investigation or as a substitute for trial testimony. Petitioner does not, nor can she, make a cogent argument that Noel's letters were testimonial.

Rather than arguing that the statements were testimonial, Petitioner argues that Crawford is not applicable because the case involved the admission of an out-of-court statement of the alleged

---

[9] Although Noel's letters were admitted by the trial court prior to Crawford being decided, the rule against the admission of testimonial statements is still applicable because the Court of Appeal affirmed Petitioner's conviction after Crawford was decided. See Meras v. Sisto, 676 F.3d 1184 (9th Cir. 2012) (finding that Crawford was clearly established Federal law in a habeas action where a state court of appeal, in 2005, affirmed the petitioner's conviction by jury trial in 2003).

*victim*, whereas <u>Bruton</u> applies to statements made by a nontestifying *codefendant*.

Petitioner's argument fails because <u>Crawford</u> and its progeny make it clear that the Confrontation Clause *only* restricts the admissibility of testimonial evidence.  <u>See</u> <u>Whorton</u>, 549 U.S. at 420 ("the Confrontation Clause has no application to [nontestimonial] statements and therefore permits their admission even if they lack indicia of reliability"); <u>Davis</u>, 547 U.S. 813, 821 (2006) (nontestimonial statements, "while subject to traditional limitations upon hearsay evidence, [are] not subject to the Confrontation Clause"); <u>see also</u> <u>Michigan v. Bryant</u>, 131 S. Ct. 1143, 1153 (2011) ("We therefore [in <u>Crawford</u>] limited the Confrontation Clause's reach to testimonial statements . . ..").

Despite the Supreme Court's limitation of Confrontation Clause violations to testimonial statements, Petitioner argues that <u>Bruton</u> is still the relevant law here because it was not expressly overruled by <u>Crawford</u>.  In support of its proposition Petitioner quotes <u>Agostini v. Felton</u>, which states that "[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." 521 U.S. 203, 237-38(1997) (citation omitted).[10]

It is true that <u>Bruton</u> has not been expressly overruled by <u>Crawford</u> or any other Supreme Court cases.  But as previously stated, the Supreme Court has made it abundantly clear that the Confrontation Clause, since <u>Crawford</u>, bars only testimonial evidence.  Rather than overruling <u>Bruton</u>, <u>Crawford</u> places a limitation on its applicability.  After <u>Crawford,</u> a court must address the question of whether a statement is testimonial as a threshold matter before it can proceed with a <u>Bruton</u> analysis.  Just as in <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987), in which the Supreme

---

[10] Petitioner also notes that "<u>Bruton</u> is cited favorably in <u>Crawford</u>," in support of her theory that <u>Bruton</u>'s holding has not been overruled and should apply to this case.  ECF No. 1 at 52. However, in the citation that Petitioner points to, the <u>Crawford</u> court offers <u>Bruton</u> as an example of one of its past decisions that is consistent with the rule limiting Confrontation Clause violations to testimonial statements that have not been tested by cross examination.  <u>Crawford</u>, 541 U.S. at 56.  This is because the statement at issue in <u>Bruton</u> *was* testimonial as the term is defined in <u>Crawford</u>.  <u>Id.</u>  The Supreme Court's mention of <u>Bruton</u> in <u>Crawford</u> cannot reasonably be read to endorse applying <u>Bruton</u>'s rule to nontestimonial statements.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Court limited the application of <u>Bruton</u> to statements that are facially incriminating, <u>Crawford</u>

2  limits <u>Bruton</u>'s applicability to statements that are testimonial, as many circuit courts have now

3  recognized.  <u>See</u> <u>e.g.</u> <u>U.S. v. Berrios</u>, 676 F. 3d 118, 128 (3d Cir. 2012) ("[B]ecause <u>Bruton</u> is no

4  more than a by-product of the Confrontation Clause, the Court's holding in <u>Davis</u> and <u>Crawford</u>

5  likewise limit <u>Bruton</u> to testimonial statements"); <u>United States v. Figueroa-Cartagena</u>, 612 F.3d

6  69, 85 (1st Cir. 2010) ("It is necessary to view <u>Bruton</u> through the lens of <u>Crawford</u> and <u>Davis</u>.

7  The threshold question . . . is whether the challenged statement is testimonial."); <u>United States v.</u>

8  <u>Smalls</u>, 605 F.3d 765, 768 n.2 (10th Cir. 2010) ("the <u>Bruton</u> rule, like the Confrontation Clause

9  upon which it is premised, does not apply to nontestimonial hearsay statements"); <u>United States v.</u>

10 <u>Johnson</u>, 581 F.3d 320, 326 (6th Cir. 2009) ("Because it is premised on the Confrontation Clause,

11 the <u>Bruton</u> rule, like the Confrontation Clause itself, does not apply to nontestimonial

12 statements."); <u>United States v. Vargas</u>, 570 F.3d 1004, 1009 (8th Cir. 2009) (<u>Bruton</u> does not

13 apply to nontestimonial codefendant statements).  As Petitioner does not even attempt to argue

14 that Noel's letters can be classified as testimonial statements, Petitioner's arguments fail.

15      The admission of the letters cannot have violated Petitioner's Sixth Amendment rights

16 since they are not testimonial statements to which the Confrontation Clause applies.

17                  **2)      The Letters Are Not "Facially Incriminating"**

18      Even assuming *arguendo* that, after <u>Crawford</u>, <u>Bruton</u>'s rule still applies to the admission

19 of nontestimonial evidence, Petitioner's claim still fails.

20      The <u>Bruton</u> rule applies only where the statement in question is facially incriminating.

21 <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987).  A "facially incriminating" statement is defined in

22 contrast to statements that implicate the defendant only in connection to other admitted evidence.

23 <u>Id.</u>  After <u>Marsh</u>, statements that are not "facially incriminating" are not subject to <u>Bruton</u>.  <u>Id.</u>

24      A codefendant's statement is facially incriminating if it is "sufficiently devastating" or

25 "powerfully inculpatory."  <u>United States v. Angwin</u>, 271 F.3d 786, 796 (9th Cir. 2001), <u>overruled</u>

26 <u>on other grounds by</u> <u>United States v. Lopez</u>, 484 F.3d 1186 (9th Cir. 2007) (citations omitted).

27      As the Court concludes in its <u>Brecht</u> analysis, *infra* at III-B-2-b, Noel's letters did not have

28 a substantial and injurious effect or influence in determining the jury's verdict.  Therefore, Noel's

letters were also not "sufficiently devastating" or "powerfully inculpatory." For this additional

reason, the statements do not fall within the rule of Bruton.

### 3) Conclusion

For the foregoing reasons, the Court concludes that the Court of Appeal's decision was not

in violation of Petitioner's clearly established constitutional rights. To the contrary, it is clearly

established that the Confrontation Clause does not bar this nontestimonial evidence and that the

statements were not "facially incriminating." While this conclusion disposes of Petitioner's Sixth

Amendment claims, the Court proceeds to address Petitioner's arguments assuming *arguendo* that

the admission of the letters did violate Petitioner's constitutional rights.

### b. Prejudicial Error

Petitioner argues that the Court of Appeal unreasonably applied Chapman in holding that

any error was harmless. Petitioner asserts that because that court stated that the evidence "was

*sufficient* without the letters," the court was not applying the legal standard set forth in Chapman,

but rather, the standard established by Jackson v. Virginia, 443 U.S. 307 (1979). Jackson sets

forth the standard for determining whether evidence is sufficient to support a conviction, and asks

"whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443

U.S. at 319 (emphasis in original). Petitioner asserts that the Jackson standard is "a highly

forgiving standard" compared to the standard set forth in Chapman.

Petitioner argues that the Court of Appeal should have applied a different standard used by

California courts, which Petitioner argues is derived from Chapman: "whether the properly

admitted evidence is so overwhelming as to the guilt of the nondeclarant that a reviewing court

can say the constitutional error is harmless beyond a reasonable doubt." People v. Archer, 82 Cal.

App. 4th 1380, 1390 (Cal. Ct. App. 2000) (citing People v. Anderson, 43 Cal. 3d 1104, 1129 (Cal.

1987)). The Court of Appeal in this case did use the term "sufficient" to describe the evidence

establishing Petitioner's implied malice for second degree murder. Knoller, 2010 WL 3280200, at

*53. However, the Court of Appeal used the term "overwhelming" with regard to the evidence

establishing that Petitioner had trouble controlling the Presas and the evidence establishing that

1    Petitioner had disregard for the public safety.  Id. at *52-53.

2         This court acknowledges the distinction between the terms "sufficient" and

3    "overwhelming."  However, while the standard used by California courts in Archer and Anderson

4    may be derived from Chapman, it is not precisely the same as the Chapman standard.  Under

5    Chapman, a federal constitutional error is deemed harmless if a court is "able to declare a belief

6    that it was harmless beyond a reasonable doubt."  386 U.S. at 24.  In fashioning a new rule for

7    harmless error, the Chapman court considered the rule utilized by the California Supreme Court in

8    People v. Teale, 63 Cal. 2d 178, 197 (1965).  In Teale, the California Supreme Court held that an

9    improper jury instruction did not result in a miscarriage of justice against the defendant, since the

10   Supreme Court deemed the evidence against him overwhelming.  Id.  The U.S. Supreme Court

11   stated that the California standard "emphasizes 'a miscarriage of justice,' but the California courts

12   have neutralized this to some extent by emphasis, *and perhaps overemphasis*, upon the court's

13   view of 'overwhelming evidence.'"  Chapman, 386 U.S. at 23 (emphasis added).  The Supreme

14   Court instead preferred its previous approach in Fahy v. State of Connecticut, 375 U.S. 85, 86-87

15   (1963), in which "[t]he question is whether there is a reasonable possibility that the evidence

16   complained of might have contributed to the conviction."  Chapman, 386 U.S. at 24. The Supreme

17   Court stated:

18              There is little, if any, difference between our statement in Fahy . . .
             and requiring the beneficiary of a constitutional error to prove
19           beyond a reasonable doubt that the error complained of did not
             contribute to the verdict obtained. We, therefore, do no more than
20           adhere to the meaning of our Fahy case when we hold, as we now
             do, that before a federal constitutional error can be held harmless,
21           the court must be able to declare a belief that it was harmless beyond
             a reasonable doubt.
22
23   Id. at 24.  Accordingly, the Chapman standard does not encompass the idea, set forth by Teale and

24   later in Archer and Anderson, that evidence against a petitioner must be overwhelming before a

25   constitutional error can be deemed harmless.

26        But regardless of whether the Court of Appeal applied Chapman reasonably, this Court is

27   not governed by a state court's harmless error analysis.  See Merolillo v. Yates, 663 F.3d 444,

28   454–55 (9th Cir. 2011).  Rather, a federal habeas court "must assess the prejudicial impact of

1  constitutional error in a state-court criminal trial" under the standard set forth by <u>Brecht v.</u>

2  <u>Abramson</u>.  <u>Fry v. Pliler</u>, 551 U.S. 112, 121(2007).  In <u>Fry</u>, the Supreme Court explained that a

3  federal habeas court need not apply the <u>Chapman</u> standard because <u>Brecht</u> "obviously subsumes"

4  <u>Chapman</u>.  <u>Id.</u> at 120.  Accordingly, on federal habeas review, the <u>Brecht</u> standard for prejudice

5  applies, not the <u>Chapman</u> standard.  <u>See</u> <u>Pulido v. Chrones</u>, 629 F.3d 1007, 1012 (9th Cir. 2010)

6  ("Accordingly, we apply the <u>Brecht</u> test without regard for the state court's harmlessness

7  determination.").  Furthermore, because a federal habeas court applies the <u>Brecht</u> standard, it does

8  not defer to the state court's prejudice analysis.

9          Under <u>Brecht</u>, the standard for determining whether relief for constitutional error must be

10  granted on federal habeas review is whether the error "had a substantial and injurious effect or

11  influence in determining the jury's verdict."  507 U.S. at 637-38 (quoting <u>Kotteakos v. United</u>

12  <u>States</u>, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).  "The inquiry cannot be merely

13  whether there was enough to support the result, apart from the phase affected by the error. It is

14  rather, even so, whether the error itself had substantial influence."  <u>Merolillo</u>, 663 F.3d at 454 (9th

15  Cir.2011) (quoting <u>Kotteakos</u>, 328 U.S. at 765).  To determine whether the error had substantial

16  and injurious effect or influence, courts within the Ninth Circuit frequently consider the following

17  factors: (1) the importance of the witness's testimony in the prosecution's case; (2) whether the

18  testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting

19  the testimony of the witness on material points; (4) the extent of cross-examination otherwise

20  permitted; and (5) the overall strength of the prosecution's case.  <u>Merolillo</u>, 663 F.3d at 455 (<u>citing</u>

21  <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684 (1986)).

22          Petitioner asserts that the letters were prejudicial because they permitted the jury to draw

23  improper inferences concerning Petitioner's implied malice.  Petitioner argues that the letters

24  helped to establish that Petitioner had difficulty controlling the Presas and that, in general,

25  Petitioner evinced a conscious disregard of the danger to human life.

26          First, as to the Petitioner's difficulty in controlling the Presas, a review of the record

27  demonstrates that there was evidence corroborating that point, and that there was an abundance of

28  such evidence as to conclude that the prosecution's case against Petitioner was strong.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    In two October 2000 letters to Aryan Brotherhood member Bretches, Noel describes

incidents in which Petitioner chased the Presas which had escaped from the apartment upon

opening of the front door.  RT 4025, 4884.  But as the record indicates, there was a substantial

amount of other evidence establishing that Petitioner had difficulty controlling the Presas, and that

there were several incidents in which the Presas wandered freely along the sixth floor apartment

hallway.  In a letter that Petitioner herself wrote to Aryan Brotherhood member Schneider,

Petitioner admitted that she could not stop Bane if he wanted to go after another dog.  RT 4891-

92.  At trial, Petitioner testified that she could not control both Presas at the same time.  RT 4678-

79, 4856-58, 4861, 4887, 4893.  Several neighbors also testified that they observed Petitioner and

Noel struggle to maintain control of the Presas while walking them, as the Presas pulled the

defendants in different directions, and even broke free from Petitioner's grasp on one occasion.

RT 3370-71, 3496-97, 3181-82.  Other witness testimony corroborated that the Presas wandered

freely in the apartment hallway on several occasions, with one neighbor testifying that shortly

before Whipple's death, he observed one of the Presas unattended on the sixth floor.  RT 3590-91,

RT 3301-06.  Given the abundance of evidence that corroborates the assertion that Petitioner had

difficulty controlling the Presas, the prosecution's case in establishing this assertion was strong.

Accordingly, this court cannot conclude that Noel's letters had a substantial and injurious effect or

influence in establishing Petitioner's inability to control the dogs.

    As for establishing that Petitioner had a conscious disregard of the danger to human life,

the letters include the following:

- An undated letter in which Noel states that he and Petitioner laughed when reading in the

  book *Manstopper*, and that Noel noticed that a prison inmate had inserted Noel's name

  with regard to a man whose finger was bitten off.  RT 4029.

- January 11, 2002 letter in which Noel encounters Whipple and describes her as "a

  timourous little mousy blond, who weighs less than Hera."  RT 4035.

- December 27, 2000 letter sent to Aryan Brotherhood member Schneider, in which Noel

  remarks that Petitioner agreed with Noel's approval of an incident in which Schneider had

  stabbed a lawyer in court with a knife emblazoned with an Aryan Brotherhood symbol.

43

1    Noel also notes to Schneider that neither he nor Petitioner would attempt to stop Schneider

2    if he attempted to escape from the courtroom.

3    •   January 12, 2001 letter sent to Schneider and Aryan Brotherhood member Bretches

4        identifying the location of an Aryan Brotherhood dropout and prosecution witness in a

5        federal case against the Aryan Brotherhood.  The letter closed with the statement, "Hope

6        tomorrow is a good mail day.  It is always is if we hear from either you or Paul and a really

7        great day if we hear from you both . . . ."

8    As to the letter in which Petitioner laughed at the passage in *Manstopper* about Noel's

9    finger being bitten off, Petitioner herself testified that she laughed when Noel read her the passage

10   from *Manstopper*.  RT 4825-26.  Moreover, that Petitioner was laughing does not substantially

11   support the notion that Petitioner had a conscious disregard of the danger to human life any more

12   than it suggests that Petitioner was merely having a laugh at Noel's expense.  Accordingly, this

13   letter was merely cumulative and could not have had a substantial and injurious effect or

14   influence.

15       As for the letter in which Noel describes Whipple in a derogatory fashion, the letter does

16   not indicate that Knoller felt the same way as Noel, as the context of the letter suggests that only

17   Noel and the dogs were present when they encountered Whipple.  At any rate, Petitioner's

18   statements to the media -- in which she bore no responsibility for Whipple's death, and placed

19   Whipple partially responsible for the dog mauling incident -- not only corroborate, but provide

20   much more substantial evidence of, Petitioner's attitude towards Whipple than Noel's description

21   in the letter.  RT 4902-06, 4911-14.  Accordingly, this letter could not have had a substantial or

22   injurious effect or influence.

23       As for the two letters concerning the Aryan Brotherhood, the admission of these are more

24   troubling.  While they were admitted for the purpose of establishing that Noel and Petitioner were

25   associates of the Aryan Brotherhood, RT 4626, 4808-10, the letters featured unsavory activities of

26   the Aryan Brotherhood, and could have had a prejudicial impact on the jury in finding that the

27   Petitioner had a conscious disregard of the danger to human life.  Yet, as the Court of Appeal

28   noted, the letters "were not impermissibly prejudicial."  <u>Knoller</u>, 2010 WL 3280200, at *53.

United States District Court
Northern District of California

1    There was other evidence that Petitioner was affiliated with the Aryan Brotherhood, with

2    Petitioner herself testifying that had a close relationship with inmate Schneider and knew that he

3    was a member of the Aryan Brotherhood.  RT 4807-08, 4810-13, 4872-73.  And the record

4    demonstrates a substantial showing that Petitioner evinced a conscious disregard of the danger to

5    human life.  This included her making disparaging remarks about people who had complained

6    about the Presas, RT 4858-59, 4867-68, denying any responsibility for Whipple's death and even

7    placing some blame on Whipple for the attack during her media appearance, RT 4806-07, 4959,

8    and failing to call 911 or assist the dying Whipple after the Presas had attacked her.  Accordingly,

9    the Court does not find that these letters had a substantial and injurious effect.

10        In light of the strong case against Petitioner, and that much of the information was

11   corroborated by other evidence in the record, the Court concludes that the admission of Noel's

12   letters did not have a substantial and injurious effect or influence on the jury's verdict.

### 3.    Cumulative Error

14        In some cases, although no single trial error is sufficiently prejudicial to warrant reversal,

15   the cumulative effect of several errors may still prejudice a defendant so much that his conviction

16   must be overturned.  Alcala v. Woodford, 334 F.3d 862, 893–95 (9th Cir. 2003). Cumulative error

17   is more likely to be found prejudicial when the government's case is weak.  United States v.

18   Frederick, 78 F.3d 1370, 1381 (9th Cir.1996).  Where there is no single constitutional error

19   existing, nothing can accumulate to the level of a constitutional violation.  Hayes v. Ayers, 632

20   F.3d 500, 524 (9th Cir. 2011); Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir.2002). Similarly,

21   there can be no cumulative error when there has not been more than one error.  United States v.

22   Solorio, 669 F.3d 943, 956 (9th Cir. 2012).  Accordingly, the Court finds no cumulative error.

### C.    Certificate of Appealability

24        The federal rules governing habeas cases brought by state prisoners require a district court

25   that issues an order denying a habeas petition to either grant or deny a certificate of appealability.

26   See Rules Governing § 2254 Case, Rule 11(a).

27        A judge shall grant a certificate of appealability "only if the applicant has made a

28   substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

United States District Court
Northern District of California

45

1    certificate must indicate which issues satisfy this standard. 28 U.S.C. § 2253(c)(3). "Where a

2    district court has rejected the constitutional claims on the merits, the showing required to satisfy

3    § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find

4    the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel,

5    529 U.S. 473, 484 (2000).

6           Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of

7    appealability (COA) under 28 U.S.C. § 2253(c) is GRANTED as to Petitioner's Right to Counsel

8    claim and DENIED as to Petitioner's Confrontation Clause claim, because as to the latter claim,

9    Petitioner has not demonstrated that "reasonable jurists would find the district court's assessment

10   of the constitutional claims debatable or wrong." Slack, 529 U.S. at 484.  The COA on

11   Petitioner's Right to Counsel claim does not obviate the requirement that Petitioner file a notice of

12   appeal within thirty (30) days.

**IV.    CONCLUSION**

14          For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a

15   certificate of appealability is GRANTED IN PART.

16          The Clerk shall enter judgment in favor of respondent and close the file.

17          **IT IS SO ORDERED**.

18   Dated:  July 3, 2014

19                                          _____
20                                                      JON S. TIGAR
                                             United States District Judge